THE STATE OF IOWA, Appellee, v. EARL MADDEN, Appellant.

**INDICTMENT AND INFORMATION:** Duplicity—Conspiracy—

1 **Overt Acts.** An indictment is not tainted with the vice of duplicity which charges a conspiracy: (a) to burn property and to commit arson, and (b) with intent to injure the insurers, even though the pleader unnecessarily proceeds to enumerate the different buildings burned in pursuance of the conspiracy, the defendant being put on trial and tried for conspiracy only.

**INDICTMENT AND INFORMATION:** Conspiracy—Designating

2 **Crime—Generally Recognized Name—Arson.** The meaning of the term ''arson'' has been much enlarged over its common law meaning and is now generally used to designate the malicious or wilful destruction of all buildings. (Secs. 4776–4780, Code.) The term may be so used in charging conspiracy.

**CONSPIRACY:** Overt Acts—Conviction for. Of course, an accused

3 on trial for conspiracy to commit arson cannot be convicted of arson, though such arson may be shown to establish the conspiracy.

**TRIAL:** Stereotyped Objections—Hearsay. The dragnet objection,

4 ''incompetent, irrelevant and immaterial,'' does not embrace the idea of ''hearsay.''

**WITNESSES:** Gambling on Favorable Reply—Objections Not Timely.
5 A party will not be permitted to gamble on the answer of a witness—retain it if pleasing, move to strike if disappointing.

**TRIAL:** Cross-Examination—Bias and Credibility of Witness—Discretion of Court. Just when the floodgates should be closed down to cross-examination lies largely in the good judgment of the trial judge. In instant case, *held*, defendant had no cause to complain of the time of closing, even though the examination related to the credibility and bias of the witness.

**EVIDENCE:** Opinion on Value—Foundation for—Competency.
7 Whether a witness is competent to give his opinion as to values is a matter quite largely in the discretion of the trial judge, the weight of the opinion to be judged of by the jury.

PRINCIPLE APPLIED: (a) Witness was a drayman, showed some knowledge of the value of household property (the kind in question), handled all that went on his wagon and described the character thereof. (b) Another witness saw the furniture unloaded, noticed its ancient appearance, described it and stated he knew in a general way the value of such property. *Held*, both were competent.

**TRIAL:** Witnesses—Excluding Answer—Necessity for Error to Appear. When a witness is prevented, on objection, from answering, counsel should, by some proper offer or record, show what he intends to establish. Conjecture as to what the answer might be will not justify a reversal.

**TRIAL:** Argument—Reference to Failure of Co-Defendant to Testify. A reference in argument to the failure of a co-defendant, not on trial, to testify is permissible.

**CONSPIRACY:** Declarations and Acts of Co-Conspirators—Limitations—Instructions as a Whole. It is neither fair nor permissible to construe each and every instruction as though it were the only one given. An instruction largely explanatory as to the "manner" of proving a conspiracy, but possibly subject to the objection that it did not limit declarations and acts of co-conspirators to those made at the time of the formation of the conspiracy and up to its consummation, was fully cured by other instructions properly stating such limitation.

**CONSPIRACY:** Conviction—Evidence—Sufficiency—Facts Reviewed.
11 Evidence reviewed and held to sustain conviction for conspiracy to commit arson.

*Appeal from Union District Court.*—HON. T. L. MAXWELL,
Judge.

TUESDAY, OCTOBER 6, 1914.

REHEARING DENIED TUESDAY, MAY 11, 1915.

THE appellant, James Saling and Evert Emerson were indicted, charged with the crime of conspiracy to burn certain buildings and contents for the purpose of injuring the insurers. Appellant Madden was tried separately, and from a judgment against him he appeals.—*Affirmed.*

*E. A. Lee, D. W. Higbee, S. A. Allen* and *Temple & Temple,* for appellant.

*George Cosson,* Attorney General, and *John Fletcher,* Assistant Attorney General, for the State.

PRESTON, J.—1. Appellant asks a reversal because of alleged error in overruling his motion in arrest of judgment and for a new trial: because, as he says, the indictment is bad for duplicity; because of the insufficiency of the evidence to support the verdict; error in instructions given and in the admission of testimony.

As to the first point, appellant contends that the indictment charges the commission of more than one offense. The indictment charges a conspiracy to burn property and commit a felony, to wit, arson. The defendant was put upon trial and tried for the single offense of conspiracy. The indictment alleges overt acts as a result of the conspiracy, in that it is charged that there were attempts to burn and burnings as a consummation of the conspiracy. It is also charged that it was with intent to injure the insurers of the several buildings and contents, which were described in the indictment. There could be several burnings under one unlawful combination or agreement. The indictment does not charge a conspiracy and, in addition, a separate and distinct charge of burning, as in some of the cases cited. As stated, the charge is conspiracy, and that the burning was the result or object of the conspiracy.

1. INDICTMENT AND INFORMATION: duplicity: conspiracy: overt acts.

It has been held that where an indictment charges a conspiracy and also an overt act, which is in itself criminal, committed as a result of said conspiracy, the indictment is not bad for duplicity, where no conviction is sought on account of the overt act. *State v. Grant,* 86 Iowa 216; *State v. Ormiston,* 66 Iowa 143, 146.

In the *Grant case, supra,* the defendant was indicted and tried for conspiracy to obtain from several different persons their names and signatures to promissory notes, and it further charged that the defendant and his co-conspirators did obtain the signatures to promissory notes from several different persons as a result and consummation of the conspiracy. It was the claim of the defendant, Grant, in that case, that the indictment charged more than one offense. In passing upon this question, the court said:

"It is insisted with much confidence that the indictment charges more than one offense because the object, aim and purpose of the conspiracy is charged to be to obtain the signature of the several persons to several and distinct notes, and it is said each of these transactions constitutes a separate offense. The agreement to do these several acts, though consummated at different times, and with different individuals, and in some cases by different employees of the defendants, is charged as constituting a single conspiracy. As is charged, they are but a part and parcel of a single scheme. The conspiracy might embrace the purpose and object of obtaining signatures to notes from a hundred different individuals, and, so far as that fact is concerned, it would be none the less a conspiracy. The design charged was to obtain the signatures of all the parties named, and others unknown, to notes. Must it be held, then, that although there was but one agreement or arrangement which embraced the intention to procure all these notes, as to each note and each individual the conspiracy was separate? Manifestly, such cannot be the law. The agreement of the conspirators may contemplate dealings with one man or many, at the same or at different

times, in relation to the same or different matters. While in one sense the procuring of the signature of each individual to a note was a distinct transaction, yet each and all together constituted a single illegal aim, object, purpose, and agreement, and but a single offense. These several contemplated acts were a part of a system or scheme of conspiracy. Wharton Crim. Ev., Sec. 32; *Card v. State,* 109 Ind. 415.''

It is alleged in the indictment in this case that the defendants conspired together to commit a felony, to wit, arson, and then the pleader enumerates the burnings caused by the defendants pursuant to the conspiracy.

It is also the claim of the appellant that no such crime as arson is known to the statutes of this state, and that, therefore, no crime is charged. The gist of the offense of con-

2. INDICTMENT AND INFORMATION: conspiracy: designating crime: generally recognized name: arson.

spiracy is the unlawful agreement or combination, and where this agreement is to perpetrate a crime known to the common law, or defined by statute in unmistakable terms, all that is necessary for the purpose of the indictment is to designate the offense by using the name by which it is familiarly known. *State v. Clemenson,* 123 Iowa 524. And see, as having a bearing, *State v. Hardin,* 144 Iowa 264.

This court has designated as arson the different burnings as defined and made punishable under Secs. 4776 to 4780 of the Code. *State v. Harvey,* 130 Iowa 394. Though it is true that the point was not expressly decided in the *Clemenson case,* nor do the sections of the statute designate as arson the different burnings therein provided for, yet at common law arson is generally defined as the wilful and malicious burning of a house or outhouse of another, but the definition of the word has been extended to include the wilful and malicious destruction of other property by fire. The indictment charges a conspiracy to commit a crime which is generally known as ''arson,'' and the use of that word alone would have been sufficient to advise the defendant of

the crime for which he was to be placed on trial. In addition to that, the indictment makes more specific the crime with which he is charged by setting out the different burnings that it is alleged he conspired with his co-defendants to commit. The crime intended to be accomplished by the conspiracy need not be described in the indictment with the accuracy or detail which would be essential in the indictment for the commission of the offense itself, but need only be designated as it is known to the common law or defined by statute. 8 Cyc. 665; *State v. Soper,* 118 Iowa 1, 4.

The crime that it is charged the defendant conspired to commit is included in the definition of arson as the word has become generally known and defined by the statutes and the courts.

It is true, of course, as argued by appellant, that proof of overt acts, under an indictment for a conspiracy, will not warrant a conviction of the felony perpetrated by the overt act. The jury was so instructed in this case, and it was plainly told that the conspiracy must be shown, and that there could be no conviction but for conspiracy. It is competent to prove overt acts, with other facts and circumstances, for the purpose of showing the common purpose by defendants and their intention, and to aggravate the conspiracy.

3. CONSPIRACY:
overt acts:
conviction for.

2. Defendant claimed on the trial that he and a co-defendant had hauled a certain number of loads of second-hand furniture from Creston to Cromwell, and that they put the furniture in one of the buildings burned. The teams, or some of them, had been hired for that purpose,—at least such was the claim of defendant. The State sought to prove, and there was evidence tending to show, that fewer loads were hauled. Defendant claimed that one Towne, who died before the trial, was one of the drivers hauling furniture. Towne and Stubblefield were looking after the draying business. Stubblefield, as a witness in rebuttal, testified that he had made an inves-

4. TRIAL:
stereotype
objections:
hearsay.

tigation of the books used in connection with the business, and was then asked:

Q. "I will ask you if you found in your books any charges against Mr. Madden or Mr. Saling for a trip to Cromwell?"

A. "No, sir."

The defendant moves the court to strike from the record and to withdraw from the consideration of the jury the question and answer for the reason that the same is incompetent, immaterial, irrelevant and not the best evidence. The motion was overruled, and exception taken.

The State was seeking to prove a negative, that the books did not show a charge, so that, as to the objection that the evidence called for was not the best evidence, it may be that the ruling was correct. But that question has not been argued. It is now insisted that the evidence was hearsay. The objection made did not cover the objection that the evidence was hearsay. *Iowa Homestead Co. v. Duncombe,* 51 Iowa 525; *White v. Smith,* 54 Iowa 233, 236; *Harvey v. Railway,* 129 Iowa 465, 482; *State v. Wilson,* 157 Iowa 698, 713.

Furthermore, the objection was not timely. If the question was objectionable, it was as apparent before the answer as after. Possibly counsel for defendant thought they had reason to believe the witness would answer yes, which would have been in favor of the defendant, and for this reason they may have concluded not to object, but take their chances on the answer being favorable, and, if it was not so, move to exclude it. The objection should have been made before the answer. *State v. Stutches,* 163 Iowa 4, 10; *Breiner v. Nugent,* 136 Iowa 322, 328.

5. WITNESSES: gambling on favorable reply: objections not timely.

3. Mrs. Gidley, a witness for the State, was asked on cross-examination:

6. TRIAL: cross-examination: bias and credibility of witness: discretion of court.

Q. "Isn't it a fact that at one time prior to this fire of Saling's that you stated to Mrs. Madden that her husband was intimate with Viney Bines?"

The objection to this was sustained.

Counsel for defendant said: "I want to show that there has been trouble between these people."

Court: "I don't think it would be proper to go into those details."

Complaint is made of the ruling. It is, of course, proper, on cross-examination, to interrogate a witness within reasonable bounds as to any matter of fact calculated to affect his credibility or the weight of his testimony. As to such matters, the trial court has a large discretion as to how far such details may be gone into. Aside from this, the witness was interrogated, as fully as defendant was entitled to, in regard to the same matter, after the ruling just referred to. The record shows:

Q. "Didn't Mr. Madden come to your house, didn't he meet you one night out north of the house and accuse you of having tried to make trouble between him and his wife on account of Viney Bines?"

A. "No, sir; I never did."

Q. "Now isn't it a fact that there is a good deal of high, rancorous feeling between you and Mr. Madden, and was prior to this fire of James Saling, on account of your alleged attempt to make trouble between him and his wife?"

A. "I never did it; so far as I am concerned there is no such trouble between me and Earl Madden. I can't answer for him; he will have to answer when he goes on the stand."

Q. "I will ask you if your son didn't at one time, when you were having trouble with Earl Madden, come up with a stove poker and attempt to assault him?"

A. "No, sir."

Q. "And didn't you tell your son to go back, that you were not afraid of him?"

A. "No, sir."

Q. "Nothing of that kind occurred?"

A. "No, sir."

Q. "I will ask you if he didn't, or you didn't, send over to the house, and if you didn't call H. V. Woods and ask him to call the police?"

The objection to this question was sustained, but the witness answered: "I have stated that there was no such feeling against Earl Madden or any other person."

Defendant introduced evidence tending to contradict Mrs. Gidley in regard to some of these matters, and this was done somewhat in detail.

Nolen testified that he was present at a quarrel between Mrs. Gidley and defendant, and that she was going to hit Madden with a stove poker.

Mrs. Madden also testified as to a quarrel between defendant and Mrs. Gidley.

Defendant has no just cause of complaint at this point.

4. Witness Healey was permitted, over objection, to give his opinion as to the value of the load of furniture he took from Saling's store in Creston to the Madden property in Cromwell. The objection was that the witness did not show himself competent. Witness showed he had some knowledge of values of such property, and he described in a general way the character of the goods he hauled; said he handled all the articles that went on his wagon. The evidence was admissible for what it was worth. The weight to be given to it was for the jury.

7. EVIDENCE: opinion on value: foundation for: competency.

It is argued that the court erred in allowing witness Reddick to testify as to the value of two loads of furniture. We do not find that this witness testified on that subject or that there was any objection to his evidence. From the reference to the abstract given, we suppose that witness Randolph is the one intended. The argument is not so much that the witness was not acquainted with values of such property, but that he did not observe the property closely enough to know what it was. The witness testified that he stood in front of his store and watched them unload the furniture; that he noticed

that it was old furniture, and mentioned that it was old, second-hand stuff; that he paid enough attention to the two loads to give an idea of the value. He described some of the articles he saw, and said he was acquainted in a general way with the value of second-hand furniture of that description. The evidence was admissible.

Witness McKean testified to hauling some of the furniture for Saling, and that Healey hauled one load; that Mr. Saling was after him in the daytime and he could not go in the daytime, he had to go at night. Then this question was asked:

Q. "Did you hear the conversation?"

The objection that this question was not cross-examination was sustained. It is said this was error. It was not cross-examination. Further than this, there was no offer to prove that the witness did hear the conversation, and, if he heard it, what the conversation was. We might reverse and send the case back and get an answer that he did not hear, but we would not be justified in so doing.

8. TRIAL: witnesses: excluding answer: necessity for error to appear.

The county attorney, in argument, referred to the fact that James Saling, jointly indicted with defendant on trial, did not become a witness in this case. This was objected to, and the court held that Sec. 5484 of the Code applies only to the defendant then on trial. It seems to have been so decided by this court. *State v. Hogan*, 115 Iowa 455, 460.

9. TRIAL: argument: reference to failure of co-defendant to testify.

5. Appellant complains of a clause in Instruction No. 7. We do not set out all of this instruction, but enough to show the proper connection with the part criticised. The clause criticised we give in italics. A part of Instruction 7 is as follows:

10. CONSPIRACY: declarations and acts of co-conspirators: limitations: instructions as a whole.

". . . A conspiracy may be shown, as stated above, by evidence more or less circumstantial in its character. It may be shown by what is done by each of the parties in furtherance of a

common· design, if any such acts are shown, by what system or concerted action between them appear from their acts when viewed as a whole. In determining whether or not the defendant, Earl Madden, James Saling, and Everett Emerson, or any two of them, including the defendant, Earl Madden, entered into a conspiracy between themselves as charged in the indictment, *you should consider so far as shown by the evidence, all that was said and done by the parties, whether or not they acted in concert in the accomplishment of a common purpose, what the purpose was, if the same is shown.*. And from these facts, and all the other facts and circumstances shown by the evidence, you must determine whether the defendants, or any two of them, including the defendant, Earl Madden, did enter into a compact or conspiracy between themselves to commit a felony, such as is charged in the indictment herein, as in these instructions defined to you. The proof will be sufficient if it shows that the said conspiracy was entered into Union County, Iowa, and within three years next preceding the 24th of January, 1913.''

The objection is, as counsel put it: ''This instruction is erroneous, in that it does not confine what was said and done by the parties to the time between the formation of the conspiracy and the consummation of the acts conspired to be done, but left the question open to the jury to consider all that was said or done by either of the parties at any time prior to the trial of this cause; that the acts and declarations of the parties to a conspiracy are only admissible when such acts and declarations occur in furtherance of the conspiracy and after the conspiracy is formed, and within the limit of time between the time of the forming of the conspiracy and the consummation of the acts conspired to be done.''

Taking the part of Instruction 7 in italics by itself, as counsel for appellant do in argument, it might seem that the court was covering the point as to the limit of time within which acts and declarations might be considered. But we have

set out enough of Instruction 7 to show that the court in this
instruction was referring to the manner of proof; that is, that
it might be shown by circumstances, together with acts and
declarations.

Instruction No. 10, we think, covers the objection made by
appellant. Instruction 10 is:

"Evidence has been admitted touching certain acts and
statements made by James Saling, not in the presence and
hearing of the defendant, Madden. Such acts and statements
cannot be considered by you against the defendant, Madden,
unless you find from all the other facts and circumstances in
the case that a conspiracy had been previously entered into,
substantially as charged in the indictment, and that said acts
were done, and said statements were made—if they were done
and made—by the said James Saling in the furtherance of, or
in promotion of such conspiracy, if you find there was one."

This properly limits the acts and statements of Saling,
which the jury might consider, to such as were done and said
after the conspiracy had been formed and while the agree-
ment still existed; that is, before it was terminated.

6.   Counsel for appellant contend that the evidence is not
sufficient to support the verdict, and say that they deem this
to be the ruling question in the case. It is becoming common
practice in substantially every criminal case,
and many civil cases, for counsel to present
cases in this court as though we were the triers
of fact. This is a mistaken notion. Should

11.  CONSPIRACY:
conviction:
evidence: suf-
ficiency: facts
reviewed.

we assume that function, it would tend to still further encour-
age long records, increased expense for litigants and addi-
tional labor for counsel and the court. Jurors are not infal-
lible, of course, and there may be instances where, because of
the character of the case, prejudice of the jury, or some other
cause, we ought to interfere with the finding of the jury. It
ought not to be assumed that every jury case will be tried
*de novo* in this court, and that we should assume to determine

disputed questions of fact. The writer is strongly impressed with the belief that in ordinary cases the combined judgment of twelve jurors on questions of fact is better than his own, or even a full bench of judges. The jurors see the witnesses, they are drawn from the body of the county from different walks of life, and understand the motives and feelings of the witnesses. There are other good reasons why jurors can better weigh the evidence and why they will, as a rule, more nearly arrive at the truth than judges who do not see the witnesses or the attorneys and their manner and methods, and who do not see the general conduct of the trial and the general situation which surrounds the trial of every case. Judges, as a rule, are trained only in the law. In this case, it was for the jury to say which of the witnesses, if any, they would believe or disbelieve. *State v. Lightfoot*, 107 Iowa 344.

Though there was a conflict in the evidence at some points, the jury could have found from the evidence, among other facts appearing in the record, that the buildings and furniture were over-insured; the insurance was paid, part to Madden and part to Saling; that the burnings of the building of Saling in Creston, and that of Madden, and their contents, were of incendiary origin. The Madden property was situated in the town of Cromwell, about six miles distant from Creston. This building was not a large one. Defendant claims he was fitting it up as a hotel in order to trade it off. It was burned August 1st, about eleven o'clock at night. The second-hand furniture was placed in it a few days before the fire. The building had not been opened for business and had not the appearance of being occupied. Defendant purchased the furniture from his co-defendant, Saling. As to it, the claim of defendant is that he paid Saling $50.00 in cash and secured the balance of the purchase price, $400.00, by giving a mortgage to Saling. The policy of insurance was written making the loss, if any, payable to Saling. There was evidence that Saling said Madden had paid $100.00 in cash and given a chattel mortgage for $400.00. This furniture was taken by

wagon from Creston to Cromwell by persons hired by Saling; both Madden and Saling were present and assisted in placing the furniture in the Madden house. The jury could have found that, to an inquiry made of defendant Madden as to how the fire originated at Cromwell, he explained that his wife was cleaning a dress the evening of the fire, before she left Cromwell and returned to Creston, and that it might have originated in that way. Defendant was not then married to this lady, but did afterwards, and before the trial, marry her. She was assisting him arrange the furniture and, as they claim, in preparing the property for use. They were both witnesses, and on the stand did not make any claim that the fire originated in the manner stated by defendant. The record shows, and the jury could have so found, that Saling took an interest in the affairs of Madden in connection with the insuring of the building at Cromwell and getting the furniture into the building; that on at least two occasions while the property was being delivered in Cromwell, Saling and Madden drove together from Creston to Cromwell; it was unusual for Saling to deliver goods as far as six miles from his place of business; Saling furnished the information to the insurance agent upon which the policy on the furniture was written, and also reported the loss. During the day preceding the fire, Madden and the woman who afterwards became his wife spent the greater part of the afternoon at Cromwell in and about the hotel property. About 6:30 o'clock in the evening, this woman was seen carrying a can of oil from a near-by grocery to the Madden building. Shortly after this, she and Madden drove to Creston. About 7:30 to 8:00 o'clock that same evening, Madden hired a horse and buggy at the McFee Livery in Creston. About the time the fire was discovered, about 11:00 o'clock on the night of August 1st, a buggy was seen by a witness standing at the northwest corner of the park, which was near the Madden property, and, at the time the alarm of fire was given, the horse and buggy was driven away from there on a trot. According to

the testimony of a witness who was employed by the McFee Livery, the horse hired by Madden and driven away by him about 8:00 o'clock in the evening was returned between 11:30 and 12:00 o'clock that night by Saling. No explanation is offered by the defendant as to where he drove the horse taken from the McFee Livery on the night of the fire. Saling was not a witness in the case.

These circumstances, if true, and the jury could have so believed from the evidence, in connection with the actions of defendant and Saling relating to the insurance, the placing of the property in the building, and their actions soon before the Saling fire in Creston, when they were seen together, and just after that fire occurred, coupled with the testimony of Mrs. Gidley that she saw the defendant Madden running away from the Saling home at the time of the Saling fire, with the other circumstances in the case, tend strongly to show the guilt of the defendant of the crime charged. We shall refer to the testimony of Mrs. Gidley later. Going back to the Madden fire in Cromwell, a witness testified with reference to the nature of the fire as follows:

"I got home the night of the fire about ten o'clock. In going I passed by the Madden house on the west side. As I went home there was a dim light burning. I saw it shining out of the west windows. I was awakened that night by some one calling, 'Fire.' I got up and went down town. The Madden house was on fire. When I got down to the fire there was no one there. I went right to the south kitchen door. I looked through the window in the door. I think there was a glass in it. It was all full of stuff and the fire was burning all over it. It was all in that room. It seemed to be piled up in a heap in the center of the room, right back of the door. . . . There was no fire to be seen anywhere else in the house."

The jury may have believed from all the circumstances that defendant, instead of arranging the house, setting up

the furniture, as he and the woman claimed they were doing, were preparing the property for a fire by massing it in the one room.

In regard to the Saling fire in Creston and the conduct of the defendant Madden at that time, Mrs. Gidley testifies:

"When I went out on the porch I heard somebody running and naturally supposed they were running to the fire, and when they came in view they were running in the opposite direction, running east. It was Earl Madden and he went around his house and on to the porch. He went on the north side and around to the east and onto the east porch. He had a coat and hat on. It must have been pulled down over his head. I could not say how fast he could run, he was running east and on the south side of the street, and his home is located on the south side of the street, and on the same side of the street on which Mr. Saling's home is located. In the center of the street is a big arc light. My porch is next to the arc light, to the east of the west sitting room and south of the parlor, and the arc light is in the center of Clarke and Walnut Streets. He went around north of his house and around on the east side and on the porch. I should judge from three to five minutes he came out. He didn't have any coat on when he came out, and he was pulling up his sleeves. There was a gentleman there they call Everett Emerson, he was lying in the hammock and he spoke to him and they went down towards the fire. The two of them walked west down towards Mr. Saling's fire."

The defendant denies that he was at the Saling home before the fire alarm was sounded and claims that when he went down there he had on his coat and was fully dressed, but the city marshal saw Madden at the Saling fire and corroborates the testimony of Mrs. Gidley, in part, by stating that the defendant was in his shirt sleeves, and that his sleeves were rolled up. The burning of the Saling property in Creston occurred after the Madden fire. The court with-

drew from the consideration of the jury the question as to a third fire.

We have not set out all the evidence. There are many other circumstances in the record, some against the defendant, others in his favor. There was a dispute as to some of the circumstances we have enumerated, but, from the entire record, we are satisfied that it was a question for the jury to say whether the defendant is guilty.

We are of opinion that the verdict has sufficient support. Finding no reversible error, the judgment is—*Affirmed.*

Ladd, C. J., Evans and Weaver, JJ., concur.