STATE OF IOWA, Appellee, v. FRED A. WOODMANSEE, Appellant.

No. 40376.

DECEMBER 13, 1930.

REHEARING DENIED MAY 6, 1931

598

John Fletcher, Attorney-general, Neill Garrett, Assistant Attorney-general, Carl S. Missildine, County Attorney, and Francis J. Kuble, Assistant County Attorney, for appellee.

Harry B. Grund, for appellant.

DE GRAFF, J.—One W. F. Knapp, either a short time before or shortly after midnight on December 29, 1929, was most brutally assaulted in his living rooms on the third floor of a building located on the northeast corner of Fifth and Locust Streets, Des Moines. He leased and occupied this building as owner of the Des Moines Trunk Factory. On the 10th day of January, 1930, Knapp died as a result of the assault. He was a man past 70 years of age, but was in good physical condition. He lived alone and so far as the record discloses had no relatives. It is important at this point to visualize the third floor bedroom in which the assault took place, and the following diagram will be helpful in understanding the situation. This room is approximately 11 x 18 feet. It had one window on the west side thereof which faced Fifth Street. There was but one door of entrance and exit to and from this room, and that door opened into the hallway. There was in the room a small alcove used as a dressing room.

The Franklin Hotel is located directly across the street west from the building occupied by Knapp. The lobby and windows of the Hotel face Fifth Street and are directly opposite the entrance to the stairway of the building. There are large windows on either side of the entrance to the hotel and the chairs inside of the lobby are so placed that persons occupying the chairs can look out upon Fifth Street. Briefly stated, anyone sitting in any of those chairs had a full view of the entrance to the trunk factory and to the third floor which had the one window in the

FIFTH STREET

NORTH

BED

ELECTRIC DROP LIGHT

PARTY WALL

DRESSER

FACTORY

ALCOVE

WARDROBE

TABLE

HALL

ELECTRIC DROP LIGHT

DOWN

TOILET

bedroom used by Mr. Knapp as his living and sleeping quarters.

It is evident from the record that on the night of the assault Mr. Knapp was about to retire. He had removed his clothing and was wearing his nightshirt and slippers. It is evident that he momentarily left the bedroom and had walked down the hall to the toilet room and upon his return was surprised in the alcove by his assailant. The record discloses that about 12:30 on the night in question a bellboy, employed by the Franklin Hotel, had occasion to go on an errand to a nearby drugstore

and as he left the entrance of the hotel he heard cries for help which apparently came from the bedroom window on the third floor of the building across the street. The boy stopped and listened for a moment and immediately returned and re-entered the hotel and told the incident to the hotel clerk who immediately telephoned the city police department. The bellboy forthwith returned to the street and continued to listen and watch from his post outside the hotel. While he stood there someone closed the one bedroom window, but even with the window closed the boy continued to hear cries for help. This boy was acquainted with Knapp and he testified that he recognized the voice calling for help to be that of Knapp. The boy further testified that he could hear what appeared to be someone striking or hitting something. He stood guard watching the bedroom window and the entrance way until the police officers arrived and entered the premises. He testified that no one left the building prior to the arrival of the police and that no one entered the building except the police officers. The policeman on the beat (Officer Seehan) arrived on the scene at the same time as the two officers called by the hotel clerk. These three officers rushed up the stairs to the third floor and went to the only entrance door of the bedroom occupied by Knapp. These officers, as they went up the second flight of stairs and approached the third floor heard someone scream: ''My God, you are killing me, you are killing me.'' They testified that this statement was repeated several times. Upon reaching the third floor the officers rushed through the little hall to the bedroom entrance door where again they heard this voice. Officer Brown was in the lead. He tried to open the only door of entrance, but it was locked. He then kicked in the door and the officers entered the bedroom. The electric drop light in the alcove was on, but the electric light in the bedroom was not on. The officers flashed their lights and the first thing they observed was Mr. Knapp on the floor in the alcove. Knapp was covered with blood and was sitting in a pool of blood. At once Officer Brown asked him, ''Who did it, and where is he?'' Knapp replied: ''Look out, he is behind the door,'' meaning the only entrance door to the room. Officer Brown wheeled, pulled the bedroom door toward him and there found the defendant in hiding behind the door. The officer led the man directly in front of Mr. Knapp and asked Knapp if

this was the man that beat him up and Knapp said: "Yes it was." The officer then asked Knapp if he knew the man and Knapp replied that it was Dr. Woodmansee. Knapp then said to Woodmansee: "Oh Doc, why did you do this? Doc, why did you do this?" The officers testified that Knapp kept saying that over and over again. Woodmansee made no reply, but Brown asked Woodmansee what he was doing up there, to which Woodmansee replied that he heard cries from that room as he went along the street and went up to the room. It must be remembered that there was but one door of entrance to this bedroom and when the officers arrived that door was locked. The keys which would lock and unlock the door were in Woodmansee's pocket, as hereinafter explained. Immediately after the officers entered, a search of the room was made and an iron bar was found. This bar was wrapped in brown paper. It was about an inch in diamcter and about fifteen inches long. It was found eight or ten feet west of Mr. Knapp in the center of the floor of the bedroom inside the fold of Mr. Knapp's coat, and in the pocket of the coat was Knapp's diamond ring and money. Blood covered the paper around this iron bar. The officers also found a work stool about two feet west of Knapp in the alcove and another work stool under the bed. These stools were broken and bloody and apparently had been used in the assault. Hair was found in the crusts of blood on the iron bar and on the stools. There were some clothes on the floor south of the bed and there was blood on the woodwork of the opening between the alcove and the bedroom. There was blood on the front of the entrance bedroom door and on the door casing and on the bed. Mr. Knapp, at the time the officers entered, was bleeding freely. At that time, there was blood on the face, glasses, hands and the clothing of Woodmansee. Knapp's head was cut in many places. His neck and chest were cut. His hands were covered with blood and were bleeding and some of the fingers were so badly smashed that the finger bones protruded.

At the time the officers started to carry Knapp on a stretcher from the room, he told the officers to get the key in the bedroom door, which key opened the only door to the room and to get the key to his trunk factory. The keys were not in the door, but Woodmansee was searched and all the keys were found in Woodmansee's right coat pocket. Woodmansee was then taken

to the police station. He was not talkative. He showed no evidence of intoxication. Officer Shaffer testified that he smelled Woodmansee's breath and could detect no odor of intoxicating liquor and that Woodmansee was perfectly sober and walked all right.

Officer Brown testified that in his conversation with Woodmansee he asked him how he could get into the room when the door was locked. Woodmansee made no reply. He also asked Woodmansee if there was anybody there when he went to the room and Woodmansee replied that he passed somebody in the hall and asked the officer if he did not pass someone. Brown told Woodmansee that "nobody could get out of here but you, and you ain't out."

It may be stated at this time that for three or four nights preceding the fatal assault, Woodmansee had been observed by patrons and employees of the Franklin Hotel sitting in one of the chairs in the lobby facing Fifth Street and the building occupied by Knapp. Woodmansee was not a guest or patron of the hotel. Some of the persons who had seen Woodmansee sitting near the window in the lobby had engaged in conversation with him.

After Woodmansee had been arrested, taken to jail and placed in a cell, he burned holes in his clothing and at the spots where there were blood stains. His explanation was that he was smoking a cigarette and had his coat over his head and shoulders to keep the light out of his eyes and to keep warm; that he went to sleep with a cigarette in his mouth and that his clothing took fire from the cigarette. There were spots of blood on his coat and on the legs of his trousers, but there were no holes in his suit at the time of his arrest. His shirt, while he was in jail, disappeared. Woodmansee, shortly after he was placed in jail, told Steve Howard, one of the city detectives, that he (Woodmansee) went upstairs and found Knapp on the floor about the time the police officers arrived. Woodmansee also stated that he fell down and got the blood on his clothes. The detective asked him if he wanted to make a statement about this affair to which Woodmansee replied: "You give me until this afternoon to think it over and you see me the next morning and I will tell you about it." Detective Howard did not talk to him later, but detectives Chamberlain and Castelline, together with

Miss Rinker, the stenographer of the detective department, did have a conversation with Woodmansee wherein he claimed that he had met a man whom he knew, but did not know his name, at the Wellington Hotel and that they walked to Bolton & Hay's Restaurant that evening on Fifth Street and had a couple of drinks; that they went into an alley and had a couple more drinks and when Woodmansee "came to" he found himself in Knapp's room and Knapp was saying: "Oh Doctor, Doctor." He stated he didn't know anything from the time he met the stranger until he "came to" in Knapp's room. Prior to this conversation, Woodmansee had burned the holes in his clothes. Detective Chamberlain talked to Woodmansee later at the county jail at which time the detective asked Woodmansee if he had struck Knapp, to which Woodmansee replied that he must have done so, as he was "the only one there." Woodmansee at that time made a voluntary signed statement which was introduced in evidence. At that conversation Woodmansee also said that he would not admit that he did or did not assault Knapp as he didn't remember. Woodmansee did state that he had known Knapp for several years and that the latter was a personal friend of his.

Dr. R. R. Morden, a physician and surgeon of many years' experience in Des Moines, treated Mr. Knapp at the Polyclinic Hospital and testified in detail as to the bruises and injuries received by Knapp at the time of his assault, and also testified that the cause of death was concussion of the brain, and as a secondary cause, streptococcus infection, having its origin in the bruises and wounds resulting from the assault.

The County Coroner, Dr. Wm. Carpenter, testified as to his findings relative to the injuries received by Knapp and the cause of death, based on the post-mortem examination.

Woodmansee was the sole witness called by the defense on his trial. He told the same story that he had told the officers as heretofore outlined, with the additional statement that earlier in the evening in question he had $22.00 in his pocket and that he did not know where it went. At the time of his arrest there was but 10c in his possession. Woodmansee at that time had no job or position and had not for at least one month prior to the time of the assault.

The evidence offered by the State is undisputed, ex-

cept the defendant's testimony offered in the attempted explanation of his presence in Knapp's room at and immediately prior to the appearance of the police officers. It is quite obvious that the fact finding body did not believe Woodmansee, and in the light of the record, it is not surprising that an unprejudiced and impartial jury would not believe the proffered explanation of Woodmansee.

Appellant in his brief and argument presents fifteen alleged errors upon which he predicates a reversal. No challenge was made to the indictment, by demurrer or otherwise. It was a short form of indictment, as defined and provided by Chapter 266, Laws of the 43rd G. A. (Chapter 638, Code, 1927). The indictment reads as follows:

"The grand jury of the County of Polk, in the State of Iowa, accuse Fred A. Woodmansee of murder and charge that Fred A. Woodmansee in the county aforesaid willfully, unlawfully, deliberately, premeditatedly, with malice aforethought, and with intent to kill, murdered W. F. Knapp."

This indictment did charge and accuse the defendant Woodmansee with the crime of murder in the first degree. We now turn to the propositions relied upon by the appellant for a reversal.

1. The first error has reference to an alleged dying declaration by Knapp, which the record shows was held by the court as incompetent. When the court was in fact advised of the situation so as to make a ruling thereon, the court did rule as follows: "The objection will be sustained and the jury will be admonished to disregard the statement made by the Doctor (Morden) in his testimony just given at this session." Dr. R. R. Morden, who was the physician who attended Knapp at the Polyclinic Hospital from the time of his reception there until the time of his death, was called by the State as a witness and testified without objection as to the injuries which Knapp received by reason of the assault and as to the cause of his death. Later, Dr. Morden was recalled and in this examination the Doctor was asked if he knew the condition of Knapp with reference "to his being able to get well or going to die." He answered in the affirmative and was then asked if he told Mr. Knapp anything about his condition at that time, which was

shortly before Knapp died. He again answered in the affirmative. He was then asked: "What did you tell him?" and without objection the Doctor answered: "I told him that he was not going to live." As to the reply made by Knapp to that statement, the Doctor testified: "He didn't make any reply to it." The Doctor was then asked if Knapp apparently understood the statement, and the answer was: "Yes, sir." At this point, counsel for the defendant moved that the answer be stricken from the record as a conclusion of the witness. Upon the overruling of the objection the Doctor stated that the impression received by him was based on the fact that Knapp had been perfectly rational up to that time and after that time. At this point counsel for the defendant objected on the ground as incompetent, irrelevant and immaterial and not "tending to prove it as any dying declaration." The trial court then stated that the purpose and object of the testimony is to lay a foundation for the admission of a dying declaration. The Doctor then testified that Knapp did not say anything "until they asked him a question." The Doctor was then asked: "What did he (Knapp) say?" The objection of the defendant was renewed. The court then said: "I can't find out until I know what this witness testified." The Doctor was then told to go ahead and tell the jury what Knapp said at that time. The Doctor then made answer: "He (Knapp) said Woodmansee is the man." It was at this point that motion to strike the statement was made and for the reason that it was not a part of a dying declaration as no proper foundation had been laid. The trial court then said: "Now it seems to me that the deceased must realize that condition (*in spe extremis*) before a dying declaration is competent. As I understand the rule the person making the statement must be aware of his condition and must make the statement of that knowledge and belief." Thereupon the Prosecuting Attorney said: "All that I can prove is just what Dr. Morden told him and his actions afterwards. Plaintiff excepts." It was then the court sustained the objection and admonished the jury to disregard the statements just made by the Doctor. It is to be remembered that the statement that was stricken was already properly in the record, since Knapp at the time immediately following the assault, and when police officer Brown took the defendant from his hiding place before Knapp, the

latter stated to the defendant in substance that "you (Wood-mansee) committed the assault upon me." That statement of Knapp's was clearly *res gestae*. Knapp's statement was spontaneously and contemporaneously made at the happening of the primary event, to wit, the assault in question. See, State v. Korth, 204 Iowa 1360; State v. Lewallen, 198 Iowa 382; State v. Lewis, 139 Iowa 405.

It is the claim of counsel for the defendant that the sustaining of the motion to strike and the admonishing of the jury in that particular did not cure the error in permitting Dr. Morden to relate his conversation with Knapp in reference to the latter "being able to get well or going to die." That part of the conversation went in without objection. We must assume that the jury did follow the admonition of the court. "Any error in the admission of this testimony was completely cured by its subsequent withdrawal by the court." State v. Folger, 204 Iowa 1296. There is no merit in the appellant's contention in this particular. There was no poison, toxic in character, injected into this record as to this matter, as claimed by the appellant

2. The appellant complains of the refusal of the court to give to the jury a requested instruction (No. 5). This request has reference to the "silence or failure by one under arrest for crime to deny or explain statements against him, made in his presence" and asked therein "that the fact that the defendant did not either deny or affirm the statements made by W. F. Knapp to the police officers in the presence of defendant is not to be taken by you as the truth of the charge." In the first place, Woodmansee was not under arrest at the time he was taken from his hiding place into the presence of Knapp. Undoubtedly, Woodmansee was taken by surprise by the sudden and unexpected appearance of the police officers through the locked door into the room where the assault was committed, but Woodmansee did have enough time to realize the situation and consequently hid behind the only door leading from Knapp's room into the hallway. In fact, the police officers interrupted the brutal assault upon Knapp by the only person that was in the room and by the only person who could get into the room. The door key was in Woodmansee's pocket. The statement made by Knapp to officer Brown in the presence of the defendant

within a moment or so after Knapp was found in the pool of blood and the discovery of Woodmansee behind the door, was admitted on the theory that what was said and done at that time was *res gestae* and correctly so. There was no thought on the part of anyone that this particular testimony was introduced in evidence for the purpose of an admission against interest on the part of the defendant. It will be borne in mind that the evidence shows without contradiction that Knapp, immediately prior to the entrance to the room by the officers, was crying in distress: "You are killing me, you are killing me," and the officers could hear the blows that were being struck as they approached the locked door which they were compelled to smash to gain entrance.

In the recent case of State v. Korth, 204 Iowa 1360, which involved the death of a messenger boy by poison, no one saw the deceased drink from the bottle of coffee containing the poison. The boy returned to the Western Union Office where he was working and had one of the bottles in his hand. He complained of feeling sick and dizzy and said that the coffee didn't taste good. The boy left for home. This testimony was admitted on the theory of *res gestae* over the objection of the defendant that it was incompetent, irrelevant, and hearsay. We held that if the statements were made spontaneously and approximately contemporaneously with the primary event, they were admissible as *res gestae*. To the same effect is the decision in State v. Lewallen, 198 Iowa 382. The situation in the Lewallen case is comparable with the facts in the case at bar. Acts or declarations are not required to be contemporaneously coincident with the primary fact, but must be so connected with the primary fact as to make the declaration and the main fact practically inseparable. This rule is illustrated under the facts and circumstances in State v. Lewis, 139 Iowa 405. The trial court did not err in refusing to give the requested instruction.

3. Appellant next complains, and for the first time, of the introduction in evidence by the State of the signed statement (Exhibit P) which, it is asserted, impeached the character and reputation of the defendant before he had taken the witness stand. It conclusively appears that the signed statement in question was taken in the Detective Assembly Room, December 30, 1929, and was given voluntarily by Woodmansee. It appears

in this record in question and answer form. One question reads: "Have you ever served any time in the penitentiary? A: Yes. Q: Where? A: Ft. Madison. Q: On what kind of a charge? A: A check, uttering a forged instrument." This signed statement, voluntarily given by the defendant and read to him before his signing it, contained Woodmansee's version of what took place in Knapp's room on the fatal night of December 29th. It is a complete statement as narrated by the defendant, and in passing it may be noted that Woodmansee admitted making the assault. Q: "You were the only one in that room when the police came, weren't you? A: Yes, only Mr. Knapp and myself were there. I didn't see anyone else. Q: How do you account for Mr. Knapp being beat up? A: I must have done it. I was the only one there." There is no dispute in the record as to how, when and the circumstances under which the signed statement was made. Counsel for the defendant did not move to strike that part of said statement to which he now objects, or that the same be withdrawn from the consideration of the jury. The general objection to the entire exhibit, did not contain or include the objection now urged.

A motion for new trial does not serve the function of an exception to the evidence. State v. Vandewater, 203 Iowa 94. The ground of objection to evidence must be brought to the court's attention specifically so that the trial court may rule intelligently thereon.

There is another reason why the appellant is not at this time in a position to complain as to that particular portion of Exhibit P to which challenge is first made on this appeal. Counsel for defendant in his opening statement to the jury advised the jury fully of the facts in this matter. At that time the jury was told "that he (Woodmansee) was arrested, charged with the crime of uttering a forged instrument and he was sent to the penitentiary on that check charge and served two years in Ft. Madison. He was paroled and after he was paroled went to a dental office here in the city of Des Moines. * * * The evidence will show that Mr. Knapp never knew Dr. Woodmansee was ever in the penitentiary between the time he met him before that in the city of Ft. Madison. * * * After they met here, Dr. Woodmansee informed Mr. Knapp that he was on parole and after he had been on parole for a year or so, Mr. Knapp signed

a petition, along with five others, to get Dr. Woodmansee off that parole, but he at no time had any knowledge before that that this man was ever in the penitentiary.'' Upon the witness stand the defendant himself testified to the same facts. He testified that he had been convicted of a felony and that was on *the direct examination by his own counsel.* It is quite apparent, therefore, that there was no reversible error in this particular.

4. Appellant assigns error on the part of the trial court in refusing ''to take away from the jury'' the charge of first degree murder, ''when the State failed to prove *any elements* of first degree murder.'' There is no merit in this contention.

When the state rested its evidence in chief, there was ample evidence to sustain the essentials of first degree murder which were specifically alleged in the indictment. It may be conceded that where the element of premeditation and deliberation is not shown by the evidence the court should take away from the jury the charge of murder in the first degree. State v. Leib, 198 Iowa 1315, with cases cited. The record evidence inescapably discloses premeditation, deliberation, and specific intent to kill at the time the defendant assaulted Knapp resulting in his death, and the jury so found. The instructions given by the court to the jury correctly state the law governing the essential elements of the crime of murder in the first degree, and especially this is true as to the instructions bearing on deliberation and premeditation, which words are the particular object of attack by appellant in the instant brief point. It may be further stated that the instructions correctly cover murder in the second degree, and it was for the jury to determine the degree of murder. Four forms of verdict were given to the jury, to wit, first degree murder with recommendation death penalty; first degree murder with recommendation life imprisonment; murder second degree; not guilty. The claimed error in this instance finds its predicate in Paragraph 8 of the defendant's motion to direct a verdict offered at the close of the state's evidence in chief, and this paragraph alleges that ''the state has failed to prove beyond a reasonable doubt any element which connects this defendant with any charge of first degree murder as defined in Code Section 12911 of the Iowa Code.'' This section defines first degree murder and specifically states that all murder which is per-

petrated by willful, deliberate and premeditated killing, is murder in the first degree. The instant indictment so charged and we have no hesitation in making the pronouncement that there is ample evidence to carry the case to the jury on the essential elements involved in first degree murder. The jury was justified in finding under the evidence that Woodmansee did conceal himself and awaited the return of Knapp from the toilet to his bedroom and did then and there make the assault upon Knapp, turned off one of the lights, locked the only door from the hallway to the bedroom, pulled down the only window in the room and continued the assault up to the very moment that the police officers smashed the door and entered the bedroom. If motive is desired, the record is ample in that particular. Woodmansee had no money, not even a job. He was ready to depart from the room with Knapp's money and diamond ring, when the police officers entered the bedroom. The iron pipe, still wet with blood, had also been wrapped in paper ready to be taken from the room by the defendant. The jury could well reason that Woodmansee realized he could have left the premises when he pulled down the window, but he knew that Knapp knew him and the assault at that time had been commenced but had not been completed by Woodmansee.

Section 12911, Code, 1927, contemplates and defines willful, deliberate and premeditated killing perpetrated by lying in wait or in an attempt to perpetrate a robbery as murder in the first degree. The statute expressly recognizes the fact of lying in wait as evidence of premeditation and undoubtedly would have been evidence of premeditation and deliberation if it had not been specifically included in the statute. However, its force and effect is recognized by reason of its inclusion in the statute. Section 12911 does not define classes of murder in the first degree. There is but one kind and the statute aforesaid frames the definition. As pointed out, the trial court told the jury that the burden was upon the State to prove that the killing was willful, deliberate and premeditated and having done so, it is not for the defendant to now complain so far as the indictment is concerned, which was in the first instance not challenged in- any way. It was a short form of indictment and it is not our function to retain or restore the evils which Chapter 266, Acts of the 43rd G. A., was intended to correct. The legal mind

of the 17th and 18th centuries in dealing with the phraseology of an indictment was a past master "of the art of making two words grow where only one had ever been seen before." Professor Rollin M. Perkins in "Cases on Criminal Procedure", Third Edition, p. 263. See, also, the criticism made by our eminent Justice Dillon in State v. Redman (1864), 17 Iowa 329, l. c. 334.

The offense, under the facts here revealed, was deliberate murder. No excuse is offered by the appellant, Woodmansee, for his act and deed. Support for deliberation and premeditation may be found in circumstantial, as well as direct, evidence. Quoted excerpts from some of our opinions will indicate the correctness of this assertion. We said in State v. Baker, 143 Iowa 224, l. c. 229 and 230:

"But it is contended that as to the first degree (murder) there was error, because there was no showing of deliberation and premeditation such as would sustain a conviction for that degree of murder. It is well settled that premeditation and deliberation need not exist for any particular length of time before the killing to warrant a conviction for the first degree. State v. Fuller, 125 Iowa 212; State v. McPherson, 114 Iowa 492, * * * This court has never held that the trial judge could be required by motion to enter into a critical examination of the evidence, where the proof tended to show homicide by violence, with malice aforethought, for the purpose of determining whether in his opinion the act was deliberate and premeditated. There might perhaps be cases where the circumstances of the homicide were such as that the court could say, as a matter of law, that there was no evidence of deliberation and premeditation, but such cases would be exceptional.

"Where the defendant has selected a deadly weapon, and with opportunity to deliberate has intentionally used it in a deadly manner, it would not, we think, be proper for the court to take the question of deliberation and premeditation from the jury. That under such circumstances it is proper to submit the question of first degree to the jury, although there is no specific proof of deliberation and premeditation, apart from the proof of the violent infliction of a mortal wound, has been affirmed by this court on several occasions."

Also, we suggested in State v. Dillingham, 143 Iowa 282, l. c. 284:

"There can be no serious doubt that the wounds on the head of the deceased caused his death, nor that such wounds were inflicted by the defendant with a piece of gas pipe in the boiler room at the time in question. The testimony shows that there were pieces of gas pipe in a room adjoining the boiler room before and after the quarrel; but the only evidence tending to show that the piece of pipe used by the defendant was in the boiler room and at hand when he was assaulted by his brother is his own statement that he 'picked it up'. The wound on the back of his hand, which he said was made with a knife, was slight and superficial, and the wound said to have been made with the poker was of no consequence. That the gas pipe used by the defendant was a deadly weapon cannot be questioned. Its use under the circumstances shown, and in the manner shown, unless found to be justifiable, furnished sufficient evidence of malice aforethought, deliberation and premeditation, to warrant the instructions complained of."

Again, in State v. Whitbeck, 145 Iowa 29, we declared, upon pages 36 and 37:

"Complaint is made of instructions submitting to the jury the question of defendant's guilt in the first or in the second degree of murder on the ground that the evidence did not tend to show murder in either degree. By this objection counsel seek to have us pass specifically on the sufficiency of the evidence as to willfulness, deliberation, and premeditation, and as to whether the killing was with malice aforethought. This is not within our province. The sufficiency of the evidence to support the verdict will be hereafter considered, but we are not called upon to determine whether as a matter of law there was specific evidence of premeditation, deliberation, or malice aforethought. State v. Baker, 143 Iowa 224; State v. Dillingham, 143 Iowa 282. The evidence tended to show that the blows which caused the death of deceased were inflicted with a heavy club which under proper instructions on this subject may have been found to be a deadly weapon, and deliberation and premeditation were to be determined in the light of the circumstances as they appeared from the evidence."

In State v. Troy, 206 Iowa 859, we again announced:

" 'Premeditation and deliberation need not exist for any particular length of time before the killing, and may be proved by circumstantial evidence.' "

See, also, State v. Hessenius, 165 Iowa 415.

Manifestly in the case at bar, under the circumstantial evidence presented by the state and the law as announced by the many authorities, it was the jury's duty to say whether there was premeditation and deliberation. That body found that the appellant Woodmansee premeditated and deliberated. Their verdict has support in the record.

 5. The next error recited in the brief points of appellant is that the trial court allowed hearsay testimony of the statement made by Knapp while in the hospital, and not in the presence of the defendant. There is no merit in the alleged error and for the reason that the record does not sustain the claim of defendant. Lloyd Brown, a police officer, was a witness for the State at the time the statement now complained of was made. The statement was secured from witness Brown on defendant's cross examination of said witness. Counsel for defendant referred to the fact that Brown had testified before the grand jury "about having Mr. Knapp make a statement in your presence, make a statement to you in the presence of Woodmansee that he was struck with a sap." The witness answered: "That is what he said, blackjack. I didn't find a blackjack or a sap." As a matter of record the inquiry was directed to what was said at the time that Woodmansee was brought before Knapp immediately after Woodmansee was found behind the door by the officers. The county attorney took this witness on redirect and asked him if he recalled anything else the deceased had said about how he was struck. The witness answered by detailing the facts stated by Knapp at that time and place. The county attorney then inquired of the witness if those recitals were made by Knapp in Woodmansee's presence. There seemed to have existed some misunderstanding between counsel for State and the defendant as to the place that Knapp had told the witness Brown the matters inquired of on the cross examination of Brown. The county attorney then asked the witness if the conversation to which his attention had been directed (referring

to the blackjack) had happened in the hospital. The witness answered: "No, he (Knapp) said that there was a blackjack, there in Woodmansee's presence in the room." No objection by defendant was interposed until after this last answer was made, when appellant's counsel moved to strike the statement of Knapp made in the hospital, as hearsay. Even had the objection been well based, it came too late. State v. Plew, 207 Iowa 624. An objection should be made, under such circumstances, immediately following the question and not after the answer. State v. Madden, 170 Iowa 230. In any event, there was no prejudicial error.

 6-7. The two brief points 6-7 are in no wise specific and simply state legal propositions. First, that an opening statement is not such evidence that it is admissible to allow the State to put on the stand rebuttal testimony. Second, that a defendant is entitled to four days' notice of additional testimony of witnesses prior to their testifying (Sections 13851-52, Code, 1927.) The gist of the claim made by the appellant in these two particulars is that insanity experts called to testify on rebuttal were not privileged to testify for the reason there was no issue of insanity raised by the defendant. The record discloses that when Dr. A. S. Price was called on rebuttal, counsel for defendant made the objection that he had never received notice of the testimony proposed to be given by the witness, or that the witness appeared before the grand jury in the case. The trial court thereupon said: "He is offered in rebuttal." It is the rule in this state that a witness may be called on rebuttal although he was not called before the grand jury. It may be observed that the two witnesses in question were not called to testify as insanity experts. Each of them testified to the sanity of defendant. It may be further observed that from the initial stage of this trial the counsel for defendant tried to impress upon the minds of the jurors that his client Woodmansee was laboring under mental aberration, complete lapse of memory during the interval from his entrance into the Knapp bedroom to and through the moments consumed in the brutal assault of Knapp. In fact there was no other defense, and it is obvious why such a defense was made, to wit: that during those moments Woodmansee did not, and could not, entertain

the specific intent to kill as well as other essential elements to constitute the crime charged.

Turning for a moment to counsel's opening statement to the jury at the outset of the trial, he told the jury: "The evidence will show on the part of the defendant that this defendant on the night of the murder did not know where he was from 11 o'clock in the evening of that night until he found himself in Mr. Knapp's room, and he came to when he heard somebody hollering 'Doctor, Doctor,' and then he turned on the light and the police came in." Counsel for defendant in his opening statement also said: "The evidence will also show that the father of Dr. Woodmansee died about forty-five years ago in an insane asylum. The evidence will show on the part of defendant that in the year 1920 or 1921 he had the same fit, that he had here on the night of the 29th of December, in Fort Madison (where he then resided) and committed an assault upon his wife. Later his wife divorced him by reason of the commission of that insane assault; that he is subject to temporary insanity fits and he had one several months prior, sometime in July or August; * * * that at the time this crime was committed he was in a temporary fit of insanity and did not have any intent and did not have any mind enough to form an intent to commit any crime."

Again in the cross examination of police officer Shaffer, counsel urged in the presence of the jury that this defendant was dazed, in a trance and listless, did not know what was going on at the time the officers caught him in the room at the time of the assault on Knapp. The defendant's own testimony is to the effect that from the time he left the rest room of the Savery Hotel he "was lost from there on. I do not know how I got up to that apartment." What was the purpose and intent of the statements, not only in the opening statement, but on the cross examination of the State's witnesses and by the defendant himself on this trial? There could have been but one purpose, and that was to impress the jury and to secure them to take the view that the act charged was done while the defendant was in a temporary fit of insanity, a temporary mental derangement. It may not be gainsaid that all of these claims bore on the mental condition of the defendant. Was the defendant privileged through his counsel in opening statement or by cross examination, or by his own testimony, to make such claims and offer such

proof that necessarily bore on his mental condition without the State having like privilege to show on rebuttal that the defendant was sane and in full possession of his faculties? It may not be claimed, of course, that the opening statement of counsel was evidence in the strict sense of that term, but the statement as set forth in this opinion inseparably connected with testimony of the defendant, constituted legal ground and reason why the State should not be foreclosed in showing that the defendant was in the possession of all his faculties during the time pertinent to the inquiry. Clearly, the testimony was not prejudicial to the defendant. Counsel now argues sanity, and that he was sane at the time. The State simply fortified his present position. Even if it were assumed that the testimony offered was not strictly rebuttal, no possible prejudice resulted to the defendant.

8. The defendant requested an instruction (No. 3) which defined the crime of manslaughter and upon that definition asked that manslaughter be submitted to the jury as an included offense. There is no merit in the requested instruction, and consequently the trial court did not err in refusing same. Two all sufficient reasons may be briefly stated. First, the evidence does not justify the requested instruction as to manslaughter. Under the evidence the jury could have found the defendant guilty of first degree murder, second degree murder, or not guilty. In other words, the minimum crime of which he could have been found guilty was second degree murder. The elements of the crime of manslaughter are entirely lacking. The jury might have found him guilty of second degree murder. The jury did not, and under this record the fact finding body was fully justified in returning the verdict that was returned. Second, there was no prejudice. The jury found the defendant guilty of first degree murder, notwithstanding that the court did instruct upon second degree murder. See State v. Troy, 206 Iowa 859.

9. Error is assigned based upon a remark made by the trial court in the presence of the jury. This remark of the court was made during a colloquy between the court and counsel for the defendant at the time of the introduction of the rebuttal testimony. It is the claim of the appellant that the remark constituted an expression of opinion on the part of the court. It cannot be so construed. The court asked counsel for the de-

fendant, during the discussion of the objections to the rebuttal testimony, whether there was any claim of mental aberration of the defendant. Counsel for defendant answered that it was a question for the jury to decide and did not call for expert testimony. The court made inquiry of counsel if he were raising any question as to the mental incapacity of the defendant, whereupon counsel for the defendant stated that if the State wanted to produce that kind of testimony, he demanded four days notice. The court answered that if the testimony offered was rebuttal, that he was not entitled to notice. Counsel for defendant then stated that it was not proper rebuttal and objected to it. The court then said: ''Counsel might be right if there was no issue of fact raised by the defendant'', and further stated that if counsel wanted to admit into the record that there was no issue made as to the mental condition of the defendant, then the evidence would not be permitted to go in. Counsel for defendant then said he would admit nothing and that the State had to prove its case. The court then said to counsel that it was not sought to place any burden upon the defendant, but that counsel's attitude was not clear and the court did not understand whether he was relying upon mental aberration, insanity or not. Counsel for defendant then suggested to the court that this was not a proper discussion in the presense of the jury. Thereupon the court overruled the objection and permitted the witness to testify. It is quite apparent that this controversy between court and counsel found its provocation by reason of the remarks of defendant's counsel. Counsel cannot make error and then rely upon it for reversal. The trial court had the right, from the nature of the evidence and the method pursued upon the trial by appellant, to make the inquiry from counsel that was made. Furthermore, the appellant preserved no exception to the statement or remark of the court relative to the matter. The only protest by counsel was in the statement that he did not think that the discussion was proper in the presence of the jury. No objection or exception was taken to the remarks of the court, and under the most elementary principles of procedural law, this matter cannot be urged for the first time on this appeal. See State v. Herring, (Iowa) 174 N. W. 495 (not officially reported), citing State v. Dobbins, 152 Iowa 632, and other cases.

10-11. Appellant predicates error (1) on the alleged "Mis-conduct on the part of the jury" in attending in a body, in charge of the bailiff, a theater and witnessing a comedy, and (2) in overruling the motion for new trial·based on the ground that the court refused to bring into court the bailiff and the jurors (four of whom were women) to testify as to their conduct while in attendance at the theater.

By way of prefatory statement it may be said that when the jury was impanelled and sworn to try this cause the trial court said:

"This jury will be kept together during the progress of this trial and will not be permitted to separate until the conclusion of the trial. You will be in charge of the bailiff who will provide you living quarters and meals until the trial is over. The law requires the presiding Judge to admonish the jury at each adjournment that during the periods of recess and adjournment that you are not to talk among yourselves about the case or to permit any person to speak to you on any subject connected with this trial, and if anyone attempts to do so, you will report it to this court. You should not converse among yourselves regarding the case until it is submitted to you in the final instructions of the court. This admonition will be given to you in full or referred to at each adjournment during the progress of this trial."

There is no misconduct shown by the record. There is no showing that the jurors ever talked or communicated with each other about the case at bar or any case. An affidavit of the attorney for the defendant reciting hearsay is not competent to support the claim of misconduct. It is pure hearsay. People v. Kasem, 203 N. W. 135 (Mich.). In brief, there is no competent evidence that the jury attended a theater during the progress of this trial. If no affidavit is filed by any juror stating the facts which are alleged on appeal as constituting misconduct by the jury, the court is justified in denying an application to subpoena the members of the jury for the purpose of examining them upon any subject. A verdict is not impeachable in this manner. State v. Friend, 206 Iowa 615; State v. Foster, 136 Iowa 527, l. c. 533.

12. This assignment of error is a repetition of the point

urged and argued in No. 2 and is sufficiently discussed in Paragraph 2 of this opinion. It is not argued further in appellant's brief and argument.

 13. This error is based on the giving of Instruction No. 7 by the court. The part of the instruction against which complaint is lodged reads: ''Where one person assaults another with a dangerous and deadly weapon in such a manner as is likely to kill, it will be presumed, in the absence of evidence to the contrary, that the assault is made with malice.'' This instruction was proper under the record facts. The trial court did recognize the limitation which should be inserted in an instruction of this character. The instruction did have a saving clause, to wit, the phrase ''in the absence of evidence to the contrary.'' If the killing was shown to be accidental, under provocation or because of mental incapacity, the presumption of malice would not arise, although a deadly weapon was used. State v. Townsend, 66 Iowa 741; State v. Perigo, 70 Iowa 657; State v. Sipes, 202 Iowa 173. If, on the other hand, there is no evidence of justification or excuse for the crime charged, the presumption will arise. State v. Gillick, 7 Iowa 287; State v. Hockett, 70 Iowa 442; State v. Rainsbarger, 71 Iowa 746; State v. Hayden, 131 Iowa 1; State v. Dillingham, 143 Iowa 282; State v. Gibson, 204 Iowa 1306. As heretofore stated, the saving clause in an instruction of this kind is the phrase ''in the absence of other proof to the contrary.'' See State v. Hayden, supra. In State v. Sipes, 202 Iowa 173, l. c. 187, it is said: ''This instruction (the one then under consideration) should have been qualified by saying that, in the absence of any evidence showing justification or excuse, the presumption is conclusive.'' The instruction in the instant case respected the proper limitation and consequently the alleged error in this particular avails nothing.

A reading of Instruction 7, which defined ''malice'', did not in any manner or way tell the jury, as suggested by appellant, that ''intent to kill necessarily implies deliberation and premeditation.'' Neither did the trial court suggest in that definition of ''malice'' that the appellant Woodmansee was guilty of murder in the first degree. If the appellant Woodmansee committed the assault described in the evidence, he must have acted maliciously. An excuse for the dastardly deed is

not offered. There is no reference in Instruction 7 to the elements of deliberation and premeditation necessary to constitute the crime of murder. Those essentials are fully and properly discussed in other portions of the court's charge. Obviously the trial court confined Instruction 7 to malice alone. In no event did the Court in that instruction tell or suggest to the jury that the use of a deadly weapon "in a deadly and dangerous manner" alone supported the inference of "deliberation and premeditation," as claimed by appellant. Concerning malice, premeditation and deliberation, and the inferences to be drawn from the use of a deadly weapon, we said in State v. Leib, 198 Iowa 1315, l. c. 1322:

"In a general way, murder is defined as the unlawful killing of a human being, with malice aforethought, either express or implied. Under our statute, murder is murder in the first degree if it has the additional element of premeditation and deliberation. Proof of intentional homicide, without the circumstances of mitigation or excuse, affords a presumption of malice, and therefore murder. The use of a deadly and dangerous weapon in a deadly and dangerous manner raises a presumption of malice, and therefore of murder; but in such instances, the presumption is of murder in the second, and not in the first, degree. State v. Phillips, 118 Iowa 660. The intent to kill may be inferred from the use of a deadly weapon in a deadly and dangerous manner; but it is not sufficient from this alone to draw the inference of deliberation and premeditation, for this would make one inference the basis of another, which, of course, cannot be done."

In Instruction 7 under consideration here, the trial court did not tell the jury directly or indirectly that the use of a deadly weapon supported an inference or created a presumption of first degree murder. State v. Phillips, 118 Iowa 660, presents an instruction entirely different from the one in the case at bar. Repeatedly the trial court in the Phillips case, supra, told the jury that the use of a deadly weapon created a presumption of willful, deliberate and premeditated killing, and that the defendant's act in the use of such weapon was enough to warrant the jury in presuming that he was guilty of murder in the

first degree. The instructions there and here have no parallel in this regard whatsoever.

14. This error is bottomed upon the language, in part, used in Instruction No. 10 and the language to which criticism is directed has reference to the statutory definition of first degree murder with reference to "lying in wait" and "the perpetration or attempt to perpetrate a robbery." We have heretofore discussed in this opinion this proposition. The matter bore on the question of deliberation and premeditation, and the evidence bearing thereon was a part of the history of the manner of the commission of the crime charged against this defendant.

It may be pointed out that the error alleged, to which appellant's instant brief point is directed, is because the indictment was based on premeditation and deliberation and not upon the theory of lying in wait or killing when committing robbery. No exception to the instruction complained of was taken by the appellant on the ground that the indictment was not drawn upon such theory. The exceptions taken to the instructions in question related entirely to the insufficiency of the evidence, and not to the form of the indictment. Not having presented the proposition relating to the form of indictment to the court below, the defendant is not in a position to urge it here. State v. Bamsey, 208 Iowa 796; Anthony v. O'Brien, 188 Iowa 802; State v. Burch, 202 Iowa 348; State v. Vandewater, 203 Iowa 94; State v. Jackson, 205 Iowa 592; First State Bank v. Tobin, 204 Iowa 456. We do not now decide whether the short form of indictment authorized by Chapter 266, Acts of the 43rd G. A., makes possible the proof of murder by lying in wait or in the commission of robbery without specific allegations thereof. Without proper exceptions in the trial court, the question is not before us for consideration.

15. The last error relied upon by the defendant for a reversal has reference to misconduct on the part of the county attorney in his opening statement. This point is not argued by the appellant. However, we have read the lines of the abstract to which counsel for defendant refers and upon which he predicates Error XV. We unqualifiedly state that the language used by the county attorney in his opening statement affords not the slightest ground for complaint.

We have herein reviewed the facts and circumstances dis-

closed by this record and each and every point or proposition relied upon by appellant for reversal. By reason of the crime charged and the penalty involved, we have given the record a most careful study. There is not a semblance of passion or prejudice shown by the record. The instructions given by the court are fair and find ample support in our prior decisions. The evidence is amply sufficient to sustain the verdict. It was the right of the jury under the statute on the verdict returned to make the recommendation it did make to the court respecting the penalty. With this matter we are not concerned except to determine whether the verdict returned is supported by the evidence. We have pointed out and given reasons why the errors relied upon for reversal are not sustainable. The judgment entered is affirmed.

MORLING, C. J., and KINDIG, STEVENS, ALBERT, WAGNER, and EVANS, JJ., concur.

GRIMM and FAVILLE, JJ., (dissenting).

The indictment in this case is as follows:

"The Grand Jury of the County of Polk, in the State of Iowa, accuse Fred A. Woodmansee of Murder and charge that Fred A. Woodmansee in the County aforesaid wilfully, unlawfully, deliberately, premeditatedly, with malice aforethought, and with intent to kill, murdered W. F. Knapp."

The appellant moved the court to withdraw the charge of murder in the first degree. This was overruled. Error is based on this ruling.

Code Section 12910 is as follows:

"Whoever kills any human being with malice aforethought, either express or implied, is guilty of murder."

Code Section 12911 is as follows:

"All murder which is perpetrated by means of poison, or lying in wait, or any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate any arson, rape, robbery, mayhem, or burglary, is murder in the first degree, and shall be punished with death, or imprisonment for life at hard labor in the peni-

tentiary, as determined by the jury, or by the court if the defendant pleads guilty.''

Code Section 12912 is as follows:

''Whoever commits murder otherwise than as set forth in the preceding section is guilty of murder in the second degree, and shall be punished by imprisonment in the penitentiary for life, or for a term of not less than ten years.''

Murder is the unlawful killing of a human being, with malice aforethought, either express or implied. But this is murder in the second degree under our statute, and *not* murder in the first degree.

In State v. Phillips, 118 Iowa 660-677, we said:

''Indeed, the great weight of authority is that proof of intentional homicide, without circumstances of mitigation or excuse, affords a presumption of malice, and therefore of murder; but that presumption is of murder in the second, not in the first degree. Dains v. State, 2 Humph. 439; 21 Am. & Eng. Enc. Law, 163-170; 1 McClain, Criminal Law, 365. It is true we are permitted to infer that one who shoots and kills another intends the fatal result thus produced; but to go further, and say that, having thus found the intent, we may therefrom draw the inference of deliberation and premeditation is to make one inference the basis of another, which is a violation of the fundamental principles of evidence. U. S. v. Ross, 92 U. S. 281 (23 L. Ed. 707). The seventh instruction, above quoted, seems to go to the extent of holding that intent to kill necessarily implies deliberation and premeditation. Literally construed, it makes murder in the first degree of every intentional homicide. In this we cannot concur, for the intent to kill is not necessarily inconsistent with the crime of manslaughter or murder in the second degree. Hornsby v. State, 94 Ala. 55 (10 South. Rep. 522); State v. McGuire, 87 Iowa, 142; Erwin v. State, 29 Ohio St. 186 (23 Am. Rep. 733); State v. Henderson, 24 Or. 100 (32 Pac. Rep. 1030). This is not to deny the rule that where homicide has been intentionally committed, and there is shown to have been no combat, sudden quarrel, or other provocation inducing or explaining the criminal act, the jury may therefrom find deliberation and premeditation. In such cases, how-

ever, the finding of deliberation and premeditation is not reached from the intentional killing alone, but from such killing, together with the affirmative showing of an absence of all circumstances tending to indicate the lower degree of offense.''

In State v. Leib, 198 Iowa 1315, we said:

''In a general way, murder is defined as the unlawful killing of a human being, with malice aforethought, either express or implied. Under our statute, murder is murder in the first degree if it has the additional element of premeditation and deliberation. Proof of intentional homicide, without the circumstances of mitigation or excuse, affords a presumption of malice, and therefore murder. The use of a deadly and dangerous weapon in a deadly and dangerous manner raises a presumption of malice, and therefore of murder; but in such instances, the presumption is of murder in the second, and not in the first, degree. State v. Phillips, 118 Iowa 660. The intent to kill may be inferred from the use of a deadly weapon in a deadly and dangerous manner; but it is not sufficient from this alone to draw the inference of deliberation and premeditation, for this would make one inference the basis of another, which, of course, cannot be done. State v. Phillips, supra.''

The indictment in the case at bar charges murder in the first degree because of the allegation that the killing was done with premeditation and deliberation and intent to kill. It was therefore essential that the State prove premeditation and deliberation in order to establish murder in the first degree.

In State v. O'Donnell, 176 Iowa 337, we said:

''Section 4728 (now 12911) of the Code defines murder in the first degree to be, *inter alia,* any kind of 'wilful, deliberate and premeditated killing.' To sustain the verdict, we must be able to find not only evidence of murder, but of additional elements which are as essential to convict of murder in the first degree, as is evidence that any murder was done. That this is so, is settled by our decisions that the indictment is not one for murder in the first degree if it charge no more than that the killing is merely wilful and premeditated (State v. Boyle, 28 Iowa 522) ; that, in addition to charging that the assault was wilful, deliberate and premeditated, it must be charged that the

blow constituting the assault was dealt with the purpose of killing (State v. McCormick, 27 Iowa 402; State v. Watkins, 27 Iowa 415) ; that the charge of the specific intent to kill must not by the indictment be left to inference (State v. Linhoff, 121 Iowa 632) ; and by our holdings that the proof must tend to show a specific intention to take life; that premeditation implies more than deliberation and means to meditate and deliberate before concluding to do the deed; that it means not only to take life wilfully, but to predetermine and to contrive by previous meditation (State v. Gillick, 7 Iowa 287, 311; State v. Johnson, 8 Iowa 525; State v. Sopher, 70 Iowa 494; State v. Hockett, 70 Iowa 442; State v. Shelton, 64 Iowa 333; State v. Perigo, 70 Iowa 657). The existence of this intent cannot be presumed as a matter of law. State v. Carver, 22 Ore. 602.''

The record is entirely wanting in respect to any evidence whatever to show that the act of killing was done premeditatedly and deliberately as charged. The case comes squarely within the rule announced in State v. Phillips, supra, wherein we said:

''In such cases, however, the finding of deliberation and premeditation is not reached from the intentional killing alone, but from such killing, together with the affirmative showing of an absence of all circumstances tending to indicate the lower degree of offense.''

In the instant case, there is an utter failure of any ''affirmative showing of an absence of all circumstances tending to indicate the lower degree of offense.''

When the State proved a killing by the use of a deadly weapon, malice might be inferred, and also that the fatal result was intended. This is murder. But it is murder in the second degree under our statute, and nothing more.

As is well said by Mr. Justice Weaver in State v. Phillips:

''But to go further, and say that, having found the intent, we may therefrom draw the inference of deliberation and premeditation is to make one inference the basis of another, which is a violation of the fundamental principles of evidence.''

In the instant case we have nothing whatever to show deliberation and premeditation. Grant that the jury may have found under the evidence that appellant killed the decedent with

a deadly weapon and with the intent to kill. . This makes a case of murder, but of murder in the second degree only. When the State attempts to raise that offense to murder in the first degree because of a claim that the act was done premeditatedly and deliberately, it must prove that essential element of the higher crime by competent proof, not by conjecture, or by inference piled upon another inference. There must be *proof* to support a finding of the essential element of premeditation and deliberation. The killing with a deadly weapon does not alone furnish this proof. It may be conceded for the sake of the argument that premeditation and deliberation may be established by circumstantial evidence. It is not essential that there be an eye witness to the killing to furnish such proof. Previous threats, especially when followed by preparation or arming, may furnish evidence of premeditation and deliberation. It may be proven otherwise. There is not a suggestion of anything of the kind in this case.

The appellant moved the court to withdraw the charge of murder in the first degree. The motion should have been sustained because of an entire absence of any proof of premeditation and deliberation.

If the door of surmise and conjecture is to be opened, no one can tell whether or not there was a quarrel. No one knows who was the assailant, nor can anyone tell from the evidence what provocation may have induced the criminal act. In the absence of proof of premeditation and deliberation, first degree murder was not established.

II. It is contended, however, that the jury *may* have found that the killing was perpetrated by lying in wait, or in the perpetration or attempt to perpetrate a robbery.

The court instructed the jury as follows:

"As defined to you in Instruction No. 4, murder which is perpetrated by lying in wait, or any other kind of wilful, deliberate and premeditated killing which is committed in the perpetration or attempt to perpetrate robbery, is murder in the first degree. When murder—that is, the killing of a human being with malice aforethought is perpetrated by lying in wait, or any other kind of wilful, deliberate or premeditated killing which is committed in the perpetration or attempt to perpetrate a robbery, the law implies, because of the nature of the act,

that it was done intentionally, wilfully, deliberately, premeditatedly, and with malice aforethought, therefore declares it to be murder in the first degree.

"As applied to the case under consideration, if, after considering as elsewhere instructed herein you find, beyond a reasonable doubt, that the defendant, Fred A. Woodmansee, struck the blow which caused the death of W. F. Knapp, and the said blow was struck by the said Fred A. Woodmansee while lying in wait, or in the perpetration or attempt to perpetrate a robbery on the said W. F. Knapp, then he would be guilty of murder in the first degree, and you will find him guilty and proceed to fix his punishment unless you find the defendant has established the defense of intoxication as elsewhere instructed herein, or if upon the whole record made in the case you have a reasonable doubt as to the guilt of the defendant as to either murder in the first degree or murder in the second degree, then it will be your duty to acquit the defendant."

Appellant took exception to said instruction and predicates error upon giving the same.

In the first place, the appellant was not charged with first degree murder because it was perpetrated by lying in wait or in committing a robbery. The State sought to raise the offense charged from murder to murder in the first degree by the allegation that the act was done with premeditation and deliberation. If the indictment had merely charged that the appellant murdered Knapp, without anything more, as might have been done under Section 33 of Chapter 266 of the Acts of the Forty-third General Assembly, it would have charged murder in the second degree, not in the first degree. It is also probably true that the State might have charged the appellant with the offense of murder in the first degree under the statute, and the appellant would have been entitled to a bill of particulars. But this indictment does not present such a situation. Here the charge is murder done with deliberation and premeditation and this makes a charge of murder in the first degree solely because of such allegation. This was in exact accord with the provisions of Section 2 of said Chapter 266, which is as follows: ·

"The indictment may charge, and is valid and sufficient

if it charges, the offense for which the accused is being prosecuted in one or more of the following ways:

"(1) By using the name given to the offense by statute.

"(2) By stating so much of the definition of the offense, either in terms of the common law or of the statute defining the offense, or in terms of substantially the same meaning, as is sufficient to give the court and the accused notice of what offense is intended to be charged.

"The indictment may refer to a section or sub-section of any statute creating the crime charged therein, and in determining the validity or sufficiency of such indictment regard shall be had to such reference."

The indictment did state so much of the definition of the offense murder in the first degree, to wit, premeditation and deliberation, as was sufficient to give the court and the accused notice of what offense was intended to be charged. The indictment did not attempt to charge murder in the first degree because of lying in wait, or in perpetrating robbery, or by means of poison, or in any other manner. It properly followed the statute and charged that the crime was murder in the *first* degree because it was done premeditatedly and deliberately.

Under such an indictment, could the jury convict of *first* degree murder if they found that the act was done by the administration of poison? The State chose its ground to make the offense murder in the first degree by alleging premeditation and deliberation. This it did "in terms * * * of the statute defining the offense," exactly as the statute, Ch. 266, Acts of the Forty-third General Assembly, provides. Suppose the indictment has alleged that the killing was done by administering poison, and there was no proof whatever of poison, could the court submit to the jury the question of whether or not the killing was done in an attempt to commit arson? In the instant case, the State having charged that the act was done premeditatedly and deliberately, cannot change front upon submission to the jury and claim first degree murder because of the administration of poison or the attempt to commit mayhem. Neither can it rely upon the uncharged claim of lying in wait or attempted robbery.

The "Short Form of Indictment" statute was intended to and does simplify criminal procedure, and eliminates the ancient

and cumbersome allegations that characterized the prolix indictments formerly in vogue; but the statute does not contemplate that the proper and necessary allegations of an indictment shall be a camouflage under which a defendant may be tried for an offense not referred to in the indictment or covered by any bill of particulars.

The court erred in giving Instruction No. 10.

III. Furthermore, there is no evidence upon which to support a finding that appellant was guilty of either lying in wait or robbery, actual or attempted.

In State v. Cross, 68 Iowa 180-200, we said:

"The court gave an instruction in these words: 'If the evidence is such as to satisfy you that the defendant lay in wait for the said McKune, or sought an opportunity to get into an altercation with him for the purpose of killing him; that he armed himself with a revolver to carry out that purpose, and, at the time and place in question, shot the said McKune,—the defendant's act in so doing was unlawful and criminal.' It is said that there was no evidence upon which the instruction could properly be based. We think that the ordinary meaning of *lying in wait*, as the term is used in law, is lying in ambush or concealment. See Bouv. Law Dict. There was no evidence of any concealment on the part of the defendant, and we think that the instruction should not have been given."

So in the case at bar, there is not the slightest evidence that the appellant was lying in ambush or concealment. No one knows when or how he entered Knapp's rooms. It will not do to say that "he *may* have been hiding in Knapp's room." As well say he *may* have walked boldly and openly into Knapp's room and assaulted him. Either is wholly conjectural. The fact that he sat in a public hotel lobby across the street where he could look up at the windows of Knapp's rooms some time before the killing is no evidence of concealment to commit the assault.

In State v. Tyler, 122 Iowa 125, we said:

" 'Lying in wait' means hiding in ambush or concealment. State v. Cross, 68 Iowa 180. It does not necessarily refer to the attitude of the body, but rather to its location, and the purpose of taking the person attacked unawares. It is the mental

poise of the wild beast in quest of prey, and necessarily implies malice, premeditation, deliberation, and the willful intent.''

Other courts apply a similar definition to the term ''lying in wait''. It must necessarily imply ambush or concealment. See Bouv. Law Dict.; Patterson v. State, 191 Ala. 16 (67 So. 997); People v. Miles, 55 Cal. 207.

Even if the question were in the case there is no evidence whatever upon which to base a finding that appellant was ''lying in wait.''

IV. Likewise, there is no proof that appellant was perpetrating or attempting to perpetrate any robbery. It is true that decedent's keys were found in appellant's overcoat pocket, but when or how they came there is unknown. There is not one iota of evidence that appellant attempted to rob the decedent Knapp. He had no money when searched except ten cents, and there is no claim that that belonged to Knapp. There is more evidence that appellant was attempting to perpetrate mayhem than that he was attempting robbery. Knapp was mutilated and terribly wounded. Why did not the court submit attempted mayhem as well as attempted robbery as a basis for a finding of murder in the first degree? The court erred in submitting lying in wait and attempted robbery for two reasons: (1) there was no allegation of either in the indictment; and (2) there was no evidence of either in the record.

A dastardly, outrageous, and shocking crime has been committed. The perpetrator should be amply punished as provided by law. No more grave, serious, and responsible duty can devolve upon a court than to pass upon the legal rights of one whose life is in jeopardy. No matter how heinous the offense or how merited punishment may be, our bounden duty is to declare the rules of law, without sympathy and equally without a spirit of revenge. In the discharge of this solemn and unenviable duty we have but one guide and that is to discover and pronounce the correct rules of law applicable to the case. In so doing, we see no escape from the conclusion that the trial court erred in the particulars herein set forth and by reason of such errors the case should be reversed.