STATE OF IOWA, Appellee, v. GALE JOHNSON, Appellant.

No. 42970.

JANUARY 14, 1936.

SUPPLEMENTAL OPINION ON PETITION FOR REHEARING AND
REHEARING DENIED, MAY 8, 1936.

Doran & Doran and F. S. Finley, for appellant.

Edward L. O'Connor, Attorney General, Walter F. Maley, First Assistant Attorney General, and John A. Dailey, County Attorney, for appellee.

PARSONS, J.—On May 27, 1934, about 5:20 in the morning, F. W. Sauer, a captain of the city of Burlington, Iowa, police force, received a gunshot wound, from the effects of which he died, as shown by the evidence herein, and as conceded by the defendant's attorney in open court and in the presence of the defendant in the case, which warranted the jury in finding the facts as set forth herein:

The defendant and his wife, Dessie Johnson, lived in the city of Des Moines at 1716 Logan, and had a V-8 black Ford coupe carrying Polk county license plates 77—35980, in the name of Dessie Johnson; that on May 25, 1934, at near midnight, the defendant was at the Blue Moon, a roadhouse about two miles out of Galesburg, Illinois, on highway No. 34, and that there was a large crowd there dancing and drinking; that the defendant and two others came in, the defendant having a

sawed-off or short barrel shotgun, and at least one of the others having a blue steel revolver; that a couple of shots were fired in the building, and it was learned a stick-up was in progress. One of the men went around taking money from the crowd, and the defendant stood in the doorway with a shotgun holding off the crowd. Two revolvers and a shotgun like the ones used in the stick-up were found in the house occupied by defendant and wife in Des Moines, Iowa, at the time of the arrest of the defendant. The defendant was seen in company with another man and a reddish-haired woman (not Mrs. Johnson) on May 26, 1934, about 4 o'clock p. m. at the Arcadia Club, a roadhouse near Gladstone, Illinois, about 6 miles east of Burlington; he was there a short time and left; and while there it was noticed that Johnson was very nervous. That on Sunday morning, May 27, 1934, about 5:20 a. m., Faith Hansen, a young woman of Burlington, heard voices in the alley near the building where she roomed, and thought a window was being opened and closed at the Economy Store, and she called the police. As a result of that call, Capt. Sauer and other officers came to the Economy Store building, and Sauer received a wound from a shotgun in close proximity to the Economy Store; that defendant and another man came from the vicinity of the shooting, defendant carrying a shotgun, and the other carrying a revolver, and they went to where a V-8 Ford car was parked, the defendant going to the right side of the Ford V-8 and laid his shotgun on the floor of the car, and the other man with the pistol went to the driver's side of the car; one saying to the other, "Oh hell bend them up," and the one to whom this was said went back and tried to bend the license plate down so that the county number could not be seen. On the same morning about 7 o'clock a Ford V-8 coupe was seen about 8 miles southwest of New London, a town on the road from Burlington to Des Moines, about 28 miles west of Burlington. There were two men in the car, which was traveling at a high rate of speed over a rather crooked dirt road, and one of the men in the car was heard to say, "We must angle northwest." The witness seeing this car and hearing these words was standing thirty feet back of the road, and had a side view of them; he did not notice the license plates on the car. This was on the road to Des Moines from Burlington, which is about 200 miles from Des Moines.

The further facts that could be found by the jury are that

on May 30, 1934, officers came from Burlington with a warrant to arrest the defendant, Des Moines police cooperating. They went to the acknowledged home of defendant, and there found a V-8 Ford coupé which was subsequently taken to Burlington and there identified by witnesses as like the car they testified to seeing being driven out of town, and that the license plates on said car showed that the rear plate had been bent down at one corner so as to obscure the county number; the evidence of such bending still showing on said plate. In addition, there was found on the premises of defendant a pair of rubber gloves and a sawed-off shotgun and two blue steel revolvers of about .38 caliber.

There was further evidence in the case that the defendant was taken as a prisoner to Fort Madison for safe-keeping, and while there he was heard in conversation with a convict, who said to him: "You got yourself in a hell of a fix. What did you want to smoke him down for?" and defendant replied: "It was either me or him, and I am damn sure it wasn't going to be me; I can't stand another pinch."

The defense introduced was in the nature of an alibi. The jury could believe the alibi witnesses or it could believe the four or five witnesses that saw the defendant in Illinois on the 25th and 26th of May, 1934, or the various witnesses who saw the defendant in Burlington; and could, if it believed the alibi established, have found the defendant not guilty; but it did not so find. After considering all the evidence, it found the defendant guilty of murder in the second degree. Evidently the jury must have believed the four or five witnesses who saw defendant in Illinois, and who saw him after he was arrested; and believed the witnesses who saw him in Burlington after the arrest, and all identified him, and found that the other facts and circumstances warranted his conviction.

So there was sufficient evidence to sustain the verdict, and, the jury being the judges of that, unless there is prejudicial error in the record which calls for a reversal of the case, we should not reverse.

■■■ It is claimed that the court erred in giving instructions to the jury by not going below manslaughter in the charge. In this there was no error. The rule is that an included offense must be submitted to the jury on the concurrence of two facts, to wit: First, when such included offense is an included offense

in the one charged in the indictment; and, second, when the record contains evidence justifying the jury in finding the accused guilty of such included charge rather than of some higher offense. State v. Kyne, 86 Iowa 616, 53 N. W. 420; State v. Hutchinson, 95 Iowa 566, 64 N. W. 610; State v. Trusty, 118 Iowa 498, 92 N. W. 677; State v. Egbert, 125 Iowa 443, 101 N. W. 191; State v. Barkley, 129 Iowa 484, 105 N. W. 506; State v. Ockij, 165 Iowa 237, 145 N. W. 486; State v. Harrison, 167 Iowa 334, 149 N. W. 452; State v. Perkins, 171 Iowa 1, 153 N. W. 146; State v. Buck, 205 Iowa 1028, 219 N. W. 17; State v. Wheelock, 216 Iowa 1428, 250 N. W. 617; State v. Woodmansee, 212 Iowa 596, 233 N. W. 725.

In the trial of the case there was a concession by the defendant, through his counsel, in open court, that Capt. Sauer came to his death as a result of the gunshot wound inflicted. The court in its instructions did not submit any charge below manslaughter. It being admitted in the record in this case that Capt. Sauer died from the wound inflicted on him on the morning of May 27, 1934 whoever inflicted that wound was guilty of causing the death of Sauer. There is nothing in the record whatever that would have justified the giving of any of the instructions on a lower degree, because, when death results, as the result of the act herein charged, it is homicide, which is divided into first degree murder, second degree murder, and manslaughter, the unlawful killing of a human being without malice. State v. Woodmansee, 212 Iowa 596, 233 N. W. 725, says the court need not and should not instruct on manslaughter when the record reveals no element of such offense, and lays down the rule that, in the absence of evidence to the contrary, the use of a deadly weapon in a deadly manner generates a presumption of malice, but not a presumption of willfulness or premeditation. So, as manslaughter is the unlawful killing of a human being without malice, it may sometimes be not error to refuse even an instruction of manslaughter in such case.

In State v. Walker, 133 Iowa 489, on page 498, 110 N. W. 925, 929, the court said:

"The record in the case clearly shows that, if the defendant is guilty of any crime, he is guilty at least of the crime of manslaughter. We have repeatedly held that, in such cases,

it is not error to omit instructions covering a lower degree of crime included in the indictment.''

State v. Quan Sue, 191 Iowa 144, 179 N. W. 972, holds that an accused on trial for murder in the first degree has no right to demand that the court submit to the jury the included offense of manslaughter, when the record is bare of any evidence tending to prove manslaughter. The right to demand the submission of included offenses does not embrace the right to demand that the jury be turned loose in whimsical license or latitude to do as it pleases, irrespective of the evidence; and this is true though the court submits murder in the second degree.

So an examination of all these cases fully sustains the rule as laid down. Besides that, there is scattered through the Iowa reports a dozen cases or more prior to any of these cited from which can be deduced only this rule. Manslaughter being the mere killing of a human being without malice, ordinarily is given, as there may be a possibility that it may have been absent and no prejudice to the defendant may exist from the inclusion of it within the instruction.

■■■ The defendant complains of the admission of the testimony as to what took place at the Blue Moon adjacent to Galesburg, Illinois. What took place at the Blue Moon might very well account for the appearance and actions of the defendant at the Arcadia, because having just participated in a holdup at the Blue Moon the day before, it would account for defendant's nervousness in a public place only twenty or twenty-five miles away several hours later. There is nothing in the objection of the defendant that either the Blue Moon incident or the Arcadia incident was too remote in point of time to be admissible. Taking the distance that Galesburg is from Burlington, testified to, and the distance from Des Moines to Burlington, which distances we have a right to take cognizance of, if the defendant was at the Blue Moon even on the 25th and appeared on the evening of the 26th at the Arcadia, and the next morning was in Burlington at the time the crime was committed, to hold this not connected we would have to assume that it would be reasonably possible, and probable that the defendant would flee for fear of the consequences of the Blue Moon incident, come to his home in Des Moines, and then be

back at the Arcadia at the time he was. There was nothing in the evidence to show such a preposterous assumption. So while it is true, as stated in many of our decisions, and in 16 C. J. p. 588, section 1135, that evidence of other crimes committed by accused is relevant to prove his identity, but it is more correct to say that, where the commission of a crime is proved, evidence to identify accused as the person who committed it is not to be excluded solely because it proves, or tends to prove, that he was guilty of another and independent crime. So upon the question of identity alone, as well as upon the showing that he had with him at the Blue Moon a shotgun corresponding in description to the shotgun he had with him at Burlington, and to the BB cartridge and the caliber thereof that was found in his car, and that at least one of his companions had a blue steel revolver of the same make and same appearance as one found in defendant's house in Des Moines and the one carried by his companion at Burlington, there was no error in submitting such evidence.

This court in State v. Hickman, 195 Iowa 765, 193 N. W. 21, had practically this question to consider. There the deputy sheriff had been shot. An hour or two before the shooting there was a crap game at the railway Y near the depot in Shenandoah, in which a number of men participated. While the game was going on, the defendants came, and, at the point of revolvers, forced the crowd of men who were participating in the game to line up with their heels to the rail, and took from the persons of different ones considerable sums of money. A short time after the robbery some of those who were present informed the city marshal of the occurrence, and about half an hour thereafter the deceased, Patton, deputy sheriff, was also informed of the transaction, and requested his informant to go with him to identify the men who had perpetrated the holdup. Patton telephoned to Bingham to have men there arrest the parties and hold them until he should come. Patton and two or three others went to Bingham on the train, and, as it approached the depot in Bingham, defendants were seen running ahead of the train toward some tie piles a short distance from the depot. About the time the train passed the tie piles, before the train stopped, the city marshal said to Patton, "Here they are Bert," and Patton came across from the east side of the train and jumped off on the southeast side of the station,

and immediately a number of shots came from the vicinity where defendants had hid themselves. There was evidence tending to show defendants admitted they fired five shots; one of them fired three shots and the other two shots. On this state of facts the court, on page 772 of 195 Iowa, on page 25 of 193 N. W., says:

"It is thought by appellant that the court erred in permitting evidence of the transaction in the afternoon at Shenandoah, because it was a transaction separate and distinct from the charge in the indictment. It is, as contended by appellant and supported by authorities cited, the general rule that the state is not permitted, in its effort to establish the crime charged, to introduce evidence of another substantive offense. But the rule is that, where the acts are all so closely related in point of time and place, and so intimately associated with each other, that they form a continuous transaction, the whole transaction may be shown,—what immediately preceded and what immediately followed the act complained of,—for the purpose of showing the *scienter* or *quo animo* of the party charged. Every fact, every circumstance, surrounding the parties, attending their action, from the time of the meeting to the separation, is material to a proper understanding of their relationship, and has probative force in establishing their conduct towards each other." Then says: "Conceding that the holdup in the afternoon was a separate offense, it was closely and directly related to the killing, a short time thereafter. The afternoon transaction was material, as throwing light upon the purpose, motives, and intention of the defendants in the later shooting. They were conscious of having committed a felony a short time before. They were trying to escape, and to prevent arrest. Their conduct and the circumstances were such as to show that they were expecting arrest."

The opinion then calls attention to the fact that this evidence was not denied. It further says: "We think, too, the evidence was admissible on the question of identity of the defendants. Witnesses present at the transaction in the afternoon identified the two defendants; identified their hats, their weapons, and their clothing. They were identified by the same witnesses, shortly before the train arrived at Bingham, as the same persons they had seen in the afternoon, at and even be-

fore the holdup." Then the court calls attention to the fact that a peace officer, the deputy sheriff, had a right to make an arrest without a warrant at the time he was shot attempting to apprehend the defendants, where a public offense had in fact been committed, and he had reasonable ground to believe that the person to be arrested had committed it. So under this authority there can be no question about the admissibility of the testimony complained of. The circumstances under which the person was seen can be given in the evidence to establish the identity. What were the means of observation of the person identified? It could only be claimed that this was not admissible because it was the commission of another crime for which the defendant could be indicted. Unfortunately for the defendant, instead of the witnesses seeing him in a church choir, they saw him committing the crime; they agree on that. And there is no reason why the circumstances under which he was seen cannot be shown, even though it shows another crime in cases of this character.

Regina v. Briggs, 2 Moody & R. 199, an old English case, holds that, where one has committed a crime and is on trial for another crime, and it becomes material to show that the defendant was in the vicinity of where the crime for which he is on trial was committed, a witness as to his presence at or near the crime may go into all the circumstances of his meeting or seeing the defendant, even if it involves the commission of another crime.

State v. Leroy, 61 Wash. 405, 112 P. 635, 638, lays down the rule:

"Testimony otherwise relevant does not become incompetent because it may tend incidentally to show that the accused has committed another crime."

To the same effect is Reed v. State, 54 Ark. 621, 625, 16 S. W. 819; People v. McGilver, 67 Cal. 55, 7 P. 49; People v. King, 276 Ill. 138, 114 N. E. 601; Richardson v. Commonwealth, 166 Ky. 570, 579, 179 S. W. 458, 459; Morse v. Commonwealth, 129 Ky. 294, 111 S. W. 714; People v. Thau, 219 N. Y. 39, 113 N. E. 556, 3 A. L. R. 1537; State v. Balch, 136 Mo. 103, 37 S. W. 808; Underhill on Evidence (3d Ed.) section 154.

So there was no error in the admission of the Blue Moon incident.

■■■ The evidence shows that Galesburg, Illinois, is about 40 miles out of Burlington. Everybody knows that Illinois is across the Mississippi east of Burlington. So the courts know that, and have the right to take judicial notice of it. The courts of this state may and do take judicial notice of the distances between cities in this state and the direction of one from the other, and that Burlington is something over 200 miles southeast of Des Moines, thus making Galesburg over 240 miles from Des Moines. The theory of the state in offering testimony as to the Blue Moon and Arcadia incidents is that defendant left Des Moines carrying with him, and bringing back to Iowa with him, the shotgun with which Capt. Sauer was killed, as well as one or more blue steel revolvers. It was not the hunting season; there was no need for a shotgun, especially for the variety carried by defendant. He was at the Blue Moon about midnight of May 25th, and at the Arcadia in the evening of the 26th; and he was in and about the vicinity of Burlington all that time. By "vicinity" we mean close, for in these days of automobiles one who was at Galesburg, in point of time, was within two miles of Burlington, compared with one trudging along on foot in the days before automobiles. It was possible the theory of the state was that he went out on an unlawful expedition armed as he was. He was one of these modern bandits, picking up everything he could pick up. The theory, he did not stay around in the vicinity of Burlington, but came home, involves his returning to Des Moines after midnight of the 25th and then going back to the Arcadia by the evening of the 26th, and then into Burlington at 5:20 on the morning of the 27th. Such an assumption would be absurd. The evidence was admissible to show what the defendant was doing; that he had no legitimate mission there; and that he had the gun with him. Men who go armed as defendant was armed, with such deadly weapons, not showing any legitimate purpose, should not be permitted to be immune from having their doings shown for the purpose of identification of the persons and arms, their lingering about the scene of the crime, with no shown legitimate purpose. Of course men charged with a crime have rights. So does the State in its efforts to suppress crimes have rights. It has the right to identify the defendant as having been seen where he was, in a position to commit the crime, and as having been armed with the weapons used in the committing of the

crime. And, if it incidentally appears that the identification of the defendant is made under such circumstances as to show he was in a position to commit the crime, i. e., in the neighborhood, that as a part of the identification he was armed with such a weapon as the defendant had when he raided the Blue Moon, such testimony is admissible as a part of the evidence, as to the man who had the weapon, and it is no reason that the State should be deprived of this testimony because the defendant was in the commission of another crime which the parties saw him commit. All this could be gone into and would be gone into on cross-examination by the defendant's attorneys, if the evidence would show that he was then engaged in an honest and legitimate business or purpose. That would give a reason for him being in the neighborhood, a reason for being armed with such deadly instruments. It is about time that criminals were let to know that they cannot shield themselves from having their actions shown under such circumstances as the defendant acted at the Blue Moon, if it becomes necessary to show that the defendant on trial is one of the parties engaged in such a cowardly, vicious murder as that of Capt. Sauer at Burlington on that Sunday May morning.

The trial court ruled on this matter during the trial, and in instruction 20 told the jury that "all testimony of the witnesses Gall and Daughterty (who were witnesses to the Blue Moon incident) is withdrawn from your consideration, except that part of such evidence relative to the description and appearance of the persons and objects testified to by such witnesses and the time and place testified about." So, if there were any error in the admission of this testimony, the instruction of the court cleared that up. But we say there was no error originally in this case.

We think the trial court went further in this than he should. We see no reason, under the authorities cited, why the testimony of what took place there, i. e., the circumstances under which the Blue Moon holdup was made, and the defendant was identified as being in it, was not entitled to go to the jury; perhaps not in its detail, but as a part of the circumstances under which the witnesses saw the defendant.

Neither was there error in the admission of the dying statement of Capt. Sauer. The evidence shows he had a sense of

impending dissolution, and hence it was not error to introduce his statement.

■■■ The admission of testimony of the conduct of the defendant at the time he was first accused of the crime was not objectionable. In fact, the rule is, the conduct of the defendant when he is accused of the crime is admissible. 16 C. J. 549, section 1057, says:

"At least in so far as they tend to connect him with the crime and are not merely self-serving, the conduct and general demeanor of the accused after the crime, his language, oral and written, his attitude and relations toward the crime, and his actions in the presence of those engaged in endeavoring to detect the criminal are always relevant, whether part of the res gestae or not." This text finds support in State v. Beckner, 197 Iowa 1252, 198 N. W. 643; State v. Pratt, 20 Iowa 267.

■■■ A great deal of comment is made by the defendant's attorney on the unfair argument of the county attorney. We have looked the record over very carefully, and, from the way the trial was conducted as disclosed by the record, the conduct of the county attorney was no more to be criticized than was the conduct of the defendant's attorneys in constant provocation, and in "side bar" remarks passed across the table. However, there is no record of whether or not whatever it was complained of was not said in answer to arguments of defendant's attorneys. The trial court heard all this; it was under the court's control; these questions that were raised were overruled by the trial court, and we think properly. In State v. Sale, 119 Iowa 1, on page 5, 92 N. W. 680, 681, 95 N. W. 193, the court says:

"We are compelled to admit that portions of the argument, as quoted by counsel from the record, seem intemperate and unnecessarily violent in their character; but we have not in the record the argument of the counsel for defendant in addressing the jury, and have no means of knowing to what extent the argument of the prosecuting attorney was justified or excused by the presentation of the defendant's case."

State v. Cameron, 177 Iowa 379, 158 N. W. 563, lays down the rule that it will be presumed, nothing appearing to the con-

trary, that argument by a public prosecutor was a legitimate response to the argument for the defendant.

■■■ The defense herein was wholly in the nature of an alibi. Evidently, of course, if the defendant was in Des Moines, he was not in Burlington at the time Capt. Sauer was shot. But that he was in Burlington the morning of the 27th of May is shown by the several witnesses who saw him there; that he was at the Arcadia, a few miles out of Burlington, at least three witnesses testified to; and that he was at the Blue Moon is equally well verified. All this testimony goes to show he was in the vicinity of Burlington during that time. So, necessarily, there was a conflict in the evidence between the State and the defendant. The jury had the right to believe the State's witnesses, and it evidently did believe them. An alibi is an affirmative defense; the burden of proof is upon the person setting up an alibi to prove it by a preponderance of evidence. Of course, if the whole record raises a reasonable doubt of his guilt, he may be found not guilty. The instructions in this case in regard to the alibi did not go as far as such instructions many times rightfully go. The court might very well have told the jury, in addition to what he said about an alibi, that the evidence of an alibi should be scanned with caution; that it is a defense easily manufactured. State v. Blunt, 59 Iowa 468, 13 N. W. 427; State v. Rowland, 72 Iowa 327, 33 N. W. 137; State v. Worthen, 124 Iowa 408, 100 N. W. 330; State v. Leete, 187 Iowa 305, 174 N. W. 253; State v. Cartwright, 188 Iowa 579, 174 N. W. 586. But the court refrained from telling the jury this.

We have not noticed everything argued here. To do so would extend this opinion way beyond the limits any opinion should be extended. We have, however, examined all the questions raised, and find none in which there is any possibility of error. We have examined the record without regard to technical errors or defects, which do not affect the substantial rights of the defendant, and finding nothing that denies the defendant any of the rights he is entitled to, and seeing from an examination of the record that the trial was fairly conducted before an able and experienced judge, and with the further fact that in our opinion the jury could not very well have rendered any other verdict than the one it did, the decision is therefore affirmed.—Affirmed.

DONEGAN, C. J., and HAMILTON, ANDERSON, KINTZINGER, ALBERT, POWERS, MITCHELL, and RICHARDS, JJ., concur.

### SUPPLEMENTAL OPINION.

PARSONS, J.—The defendant complains that the opinion as published stated that a shotgun was found at the home of the defendant. It is true, it did so state, but it was a misstatement of the facts. However, it was immaterial. The opinion shows the facts relied on were, that the defendant had a sawed-off shotgun at Galesburg where he held up a party; that he was seen leaving the vicinity of the crime charged in this action, with such a gun in his hand; that he was seen to go to a parked car of the description of the car he left town in, and that the shotgun was put in this car. The sole purpose of the testimony in regard to the gun was to show that the defendant had such a gun at Burlington and shot Captain Sauer. The jury could very well deduce this fact, and undoubtedly did, from the evidence as to the gun in this case.