STATE OF IOWA, Appellee, v. PETE RAND, Appellant.

No. 46860.

JANUARY 14, 1947.

REHEARING DENIED MARCH 14, 1947.

C. I. McNutt, of Des Moines, for appellant.

John M. Rankin, Attorney General, Charles H. Scholz, Assistant Attorney General, Vernon R. Seeburger, County At-

torney, and Ed S. Thayer, Assistant County Attorney, for appellee.

BLISS, J.—On July 9, 1945, the grand jury of Polk County, Iowa, indicted the appellant and Knote for "keeping a gambling house as defined in Sections 13198 and 13199 of the 1939 Code of Iowa," and charged that they "kept a building, house, and place, resorted to for the purpose of gambling and permitted and suffered persons in said building, house, and place, under their care and control, to play at cards, dice, and slot machines for money." The indictment was, in substance, in the words of said section 13198 (section 726.1, Code of 1946). Section 13199, Code, 1939 (section 726.2, Code, 1946), is as follows:

" 'Keeper' defined. In a prosecution under section 13198, any person who has the charge of or attends to any such house, shop, or place is the keeper thereof."

To the indictment each defendant pleaded not guilty. The trial, begun on November 19, 1945, ended on December 5, 1945, with the verdicts above noted.

The gambling house mentioned in the indictment was known as the "Mainliner Night Club." It was located at 6001 Southwest Twenty-first Street, Lot 1, Geil Place, in Bloomfield Township, Polk County, Iowa, outside the corporate limits of the city of Des Moines.

The record clearly sustains a finding that the place above described was operated as a gambling house within the meaning of said Code section 13198. While the appellant's plea of not guilty is a denial of every essential element of the crime charged, he offered no evidence, and made no contention by argument, that the place was not resorted to for the purpose of public gambling. While other errors on the part of the trial court are assigned and vigorously argued, the appellant's chief ground for reversal is the claimed failure of the State to establish that the place was operated as a resort for gambling under his care, control, charge, or attendance. It is his contention that, while he may have been about the place and worked there and performed some services in its operation, his wife, Gladys Rand,

was in fact the owner of the property and the operator of the "Mainliner Night Club."

Since the facts largely control our decision, a summary thereof, pertaining to matters in controversy, seems fitting. The building which housed the business was a large hollow-tile structure just east across the highway from the Des Moines Airport. Meals were served to the public in a large dining hall, approximately seventy by one hundred feet. An orchestra and dancing space and floor shows were provided for the patrons. There were four liquor bars in the place. Just north of the dining room was a taproom about thirty feet square. Just east of the taproom and connected with it by a wide hall was a room fifty feet square.

The public records in the office of the Polk county recorder show that Frank Cardamon conveyed this property to Gladys Rand, grantee, by deed dated December 18, 1943, and that Gladys Rand, by deed dated January 2, 1945, conveyed a one-half interest therein to Peter A. Rand, husband of the grantor. The land conveyed was Lot 1, in Geil Place, excepting one thousand fifteen feet thereof, in an official plat of Bloomfield Township. Certified copies of the deeds were introduced.

Proceedings of the Polk county board of supervisors, being a part of the public records in the county auditor's office, show that on the application and bond of Gladys Rand, a Class B beer permit was issued on December 30, 1944, to "Gladys and Peter Rand" at the "Mainliner," covering a period to December 10, 1945. An exact duplicate of the permit issued to them was received in evidence. The permit was the only beer permit to them or either of them in existence in June 1945. A beer permit was on the north wall of the taproom in the "Mainliner" when officers searched the place on June 22, 1945.

The Bloomfield township assessor was a witness for the State. He made his assessment of the Mainliner Night Club property, both real and personal, on April 6, 1945. He talked with the appellant about the details of the assessment. He made his inquiries about the items of property of appellant and the latter answered. He identified the slot machines and the dice tables, which were exhibits received in evidence at the appellant's

trial, as being part of the personal property at the "Mainliner" when he made the assessment. The dice tables were included in his assessment. They were in the northeast room, hereinabove referred to. The slot machines—"he imagined there were a dozen or more"—were in "a sort of barroom." That was the taproom mentioned above. The appellant told the assessor that he did not own the slot machines. But he did not state to whom they did belong. There is no other testimony respecting their ownership. The dice tables were assessed to the appellant with his assent. The legal description of the lot, which was assessed at $1,500, was Lot 1, Geil Place, in Bloomfield Township. The personal property was assessed at $3,500. A $10,000 assessment was placed on the "Mainliner" building. The assessment roll was signed by appellant in the presence and view of the assessor. A carbon copy of the assessment roll was given to the appellant by the assessor. The original of the roll was received in evidence. There is no denial of any of this testimony of the assessor. The witness identified Exhibits 20 and 21—"black jack" tables—and Exhibits 1, 2, 3, 4, 5, 6, 7, 8, and 9—slot machines—as resembling tables and articles that he saw at the "Mainliner" when he made the assessment. According to the testimony, "black jack" is a gambling game with ordinary playing cards.

On June 14, 1945, in the evening, Basil A. Grossnickle, a constable of Allen township, Polk county, and Robert Barton, a constable of Clay township, in said county, went to the "Mainliner" to make observations as to sales of whisky and gambling. The appellant was there at that time, about 9 o'clock p. m. He was standing behind a bar or counter with a cash register on it, talking to a man on the other side. They bought two drinks—a jigger of whisky and a bottle of beer—at the bar, in the taproom. It was not the bar at which appellant was standing. They remained five or ten minutes. While they were there the slot machines were not in operation.

Leonard Sims and Marvin C. Vanderlinden, members of the state highway patrol, testified that on September 14, 1943, about 8 o'clock p. m., a few miles south and west of Ames, Iowa, while in the performance of their duties, they stopped a small farm truck. The clerk's transcript shows—although this was

not disclosed at the trial—that their attention was directed to the truck because its taillight was not operating. One Chiesa was driving the truck and the appellant was seated with him. In the conversation the appellant identified himself, by his motor vehicle driver's license, as Peter Alfonso Rand, and told the witnesses that he was on his way to the "Mainliner," of which he was the owner. The patrolmen then took the truck, appellant, and Chiesa to Ames to the home of John Nyberg. The latter was a witness for the State. On September 14, 1943, he was a special investigator of the Iowa Bureau of Criminal Investigation. He testified that he, the appellant, the patrolmen, and Chiesa all went to the courthouse at Nevada and that he talked to the appellant and the latter told him he was Pete Rand, the owner of the "Mainliner" in Des Moines, and was on his way there.

On the evening of June 22, 1945, Grossnickle, the constable, on his sworn information, procured a search warrant for the "Mainliner" from William Schweiker, justice of the peace for Four Mile township in Polk county. He then met with Barton, constable, and two other country constables, and four or five other deputized peace officers, and they proceeded in a body to the "Mainliner." They arrived at about 9 o'clock p. m., entered at the south side of the building, checked their hats, crossed the dining room, where dinner was being served, a floor show was going on, the orchestra was playing, and all of them went into the taproom in the northwest corner of the building. The officers seated themselves, and Grossnickle ordered at the bar a jigger of whisky for himself and beers for his associates. These were served and tasted for identification. Along the south and west wall of the taproom were slot machines—fourteen in all. There were five-cent, ten-cent, and twenty-five-cent slot machines. There were slot machines which were operated by, and paid off, in red and blue ration tokens. The twenty-five-cent machines were operated by brass slugs. The machines were operated by placing a coin, token, or slug in a slot in the machine and pulling a lever. If the mechanism operated in a certain way the machine would pay off to the player coins, tokens, or slugs in various amounts. Whether there was a pay-off was

a matter of chance, unaffected by any skill on the part of the player.

The officers played the machines a few times. Grossnickle put in $5 and received $1.50 in return. Others also were playing the machines. At the end of the row of machines was a desk where the patrons could have money changed into various denominations by the attendant. The appellant was behind one of the bars part of the time. He was in the room where the slot machines were being operated, and about the place generally. The place was quite crowded and the taproom was well occupied. Drinks were served from the bar at the north side of the room. In the room to the east—the northeast room—a partial view of which could be had from the taproom through the hallway, a crap game was in progress. Grossnickle, at 9:30 p. m., announced that the raid was on. The patrons in the taproom were ordered to leave. The defendant Knote was operating the dice game. Quite a number of persons—ten or fifteen—surrounded the table and several were participating in the game. The dice would be placed in a cup and the participants would in turn roll the dice. Chips were bought. Knote, with a crooked stick, would pull in the dice, chips, or money. A box into which he placed chips and money contained $66.95. Grossnickle arrested him and placed him in custody of one of his men. In this room there was another dice table which was not being used. There were two "black jack" tables, at one of which an unengaged operator sat. Decks of cards and poker chips were found on one large table. This northeast room is referred to as the gambling room. There was also a liquor bar in operation in this room. About twelve hundred poker chips were seized. The red chips were worth $5, and the yellow chips, $1.

There was testimony that the appellant was going about in the slot-machine room, behind the bars, and in the gambling or northeast room. When Grossnickle looked for him to serve the warrant he found him leaving the building by a south door. He called to him to come back, which he did. He told him he had a warrant to serve. They came into the northeast room and Grossnickle handed the search warrant to Smith, one of his

men, who served it on the appellant. Later he asked to see the warrant and Smith read it to him.

The officers backed a truck up to the east or back door and loaded the liquor, dice, and card tables into it. The slot machines stood in metal cases and were fastened to the floor. As the officers started to remove them appellant objected to their lack of care and said he did not wish them broken up. One witness testified: "Rand told Grossnickle not to get in a hurry about taking out the slot machines. He wanted them taken out whole." Another witness testified: "I saw the slot machines being removed. Mr. Rand went back and got the keys from the drawer. He did that himself. The slot machines were removed from the cabinets." Other witnesses testified to appellant's aiding the officers with a screw driver to remove the slot machines.

While Knote was under arrest and in custody in the taproom the appellant came in and this conversation took place between them, according to the witness:

"Mr. Rand walked up to him [Knote] and asked him, 'What have they got you for?' He [Knote] said, 'I don't know.' Mr. Rand said: 'You don't know anything, do you?' He [Knote] said, 'No.' "

The officers seized and took from beneath the bar in the taproom, where the slot machines were, and beneath the bar in the northeast, or the card and dice room, ninety-nine bottles of different kinds of whisky, gin, and rum. Some liquor had been removed from many of the bottles. The bottles bore seals of Iowa, Minnesota, Wisconsin, and Illinois. Chemical tests of samples of this liquor showed it to be whisky. Waiters went about in the dining room, taproom, and elsewhere, carrying drinks from the bars to the patrons.

The gambling equipment and the liquor, and all other articles seized, after having identification marks placed thereon, were delivered into the custody of the Polk county sheriff. After the raid, Officers Kempton and Lang took the appellant and Knote in an automobile to the office of Justice of the Peace Schweiker, on East University Avenue. Kempton testified:

"There was a conversation which took place in the car, and

Rand said he didn't blame any of us boys, no hard feelings towards us, if a man is in a racket he expects it today, tomorrow or afterwhile. * * * 'I know there is something back of this and I would like to know what it is.'"

Of this conversation, Mr. Lang testified:

"Mr. Rand was talking to us in general * * *. He wasn't directing the conversation to any particular one. * * * He wondered why he was being picked on. And said he would spend a lot of money to find out. Further stated that if you were in the racket sooner or later you would get caught up with, and he didn't particularly care, he had plenty of money to take care of him the rest of his life."

There was testimony that Gladys Rand was seen about the place the night of the raid and that she asked Grossnickle or Smith to see the search warrant and it was shown to her. Neither the appellant nor Gladys Rand testified. There is no denial of any of the testimony with respect to the matters of fact set out above.

In support of his contention that he was not the "keeper" of the Mainliner Night Club as a gambling house, within the provisions of said section 13199, the appellant offered the items of evidence hereinafter noted. The deputy county recorder testified that records of trade names were kept, as provided by statute [section 9866.1, Code, 1939, section 547.1, Code, 1946], in said office, by filing therein a verified statement showing the names and addresses of each person owning or having an interest in the particular business. The witness produced Exhibit I, which he testified was the trade name of the "Mainliner." It bears the date of August 19, 1940. He testified that it was a part of the records of his office. He testified that, according to this Exhibit I, the owner of the Mainliner Club appeared to be Gladys Rand. The State moved to strike this answer for all the reasons which it had made to the offer of the exhibit, namely, that it was incompetent, irrelevant, immaterial, improper, with no bearing on the issues, and too remote in point of time. The objection and motion were overruled at that time. Appellant then offered Exhibit J by said witness, who identified it as "the

trade name signed by Gladys Rand'' and filed in his office. On objection that the offer was incompetent, irrelevant, immaterial, improper, prejudicial, with no bearing on any issue, and dated November 2, 1945, subsequent to seizure under the search warrant, the court reserved ruling on both Exhibits I and J. Later the court sustained the objections to each exhibit and struck all testimony of the deputy recorder pertaining to them upon objections previously made, and additional objection that it was collateral, hearsay, and a self-serving declaration.

Appellant, through the county treasurer as his witness, offered a canceled check, Exhibit K, apparently dated March 23, 1945, payable to the treasurer and by him deposited in his bank account. The court permitted the treasurer to testify that there had been an assessment in 1944 of personal property at 6001 Southwest Twenty-first Street, in Bloomfield township, and that the tax had been paid on March 23, 1945. On objection that the assessment roll for 1944 made no reference to any specific personal property, particularly none that was seized, and it was for a year not pertinent to any issue, was not properly identified, was incompetent, irrelevant, immaterial, and without proper foundation, and was not signed, the court refused to admit the roll and that part of the tax list of Bloomfield township pertaining thereto.

The appellant showed by a witness, who was an agent of the Federal Government charged with the administration of food rationing to all institutional and industrial users, that the Mainliner Night Club maintained an account in his office, and had filed applications at different times in the procurement of rationed foods. He testified that he knew Gladys Rand and that she was the only one from the Mainliner with whom he had dealings respecting rationing. His testimony that she drew the processed food checks against the bank ration-points account credited to the Mainliner was rejected as hearsay. Certain applications for rationed food were offered as exhibits. Objections that they were incompetent, irrelevant, immaterial, hearsay, collateral, self-serving, and without bearing on any issue were sustained.

Testimony by the secretary of the Des Moines Convention

Bureau that the Mainliner was a member thereof, and that the membership was taken out by Gladys Rand, and the monthly dues were paid by checks of the "Mainliner Night Club, 6001 Southwest Twenty-first Street" signed by her, was rejected on objection as noted just above.

Appellant then offered evidence, in the absence of the jury, of an insurance agent, that the Mainliner Night Club was a customer of his and that his dealings were with Gladys Rand, and also offered a number of policies of insurance on the buildings and personalty at the Mainliner, and casualty insurance on employees, in which Gladys Rand was named as the insured, which offers were rejected, on objection as above noted.

There were similar offers of testimony of merchants, tradesmen, mechanics, and others who had furnished services or merchandise which were paid for by checks of the Mainliner Night Club, signed by Gladys Rand, or by cash paid by her for it. Testimony was offered of an officer of a bank in which the Mainliner carried a checking account that it was authorized to honor only checks on that account signed by Gladys Rand, and the further offer to show by this witness that the utility services furnished the Mainliner were paid by its checks signed by her. These offers were all rejected.

None of the various documentary items of evidence offered by either the State or the appellant or received in evidence has been set out in the abstract, either fully or in part, and our knowledge of their contents is limited to the reference thereto in the testimony, which in most instances is rather meager.

I. As we have heretofore stated, the record amply sustains a finding that section 13198, Code, 1939, was being violated on June 22, 1945, at the Mainliner Night Club, and had been so violated for some time before. In it, and in operation, on the night of said day were customary gambling devices and paraphernalia. The legislature, by incorporating the words, "dice," "cards," and "slot machines" in sections 13198 and 13210 of said Code, recognized them as gambling devices. Parker-Gordon Importing Co. v. Benakis, 213 Iowa 136, 143, 238 N. W. 611 (it was a punchboard in that case); State v. Doe, 227 Iowa 1215, 1222, 290 N. W. 518 (slot machines and punchboards);

State v. Cowen, 231 Iowa 1117, 1124, 1125, 3 N. W. 2d 176 (slot machines). We have also held the comparatively harmless mint-vending slot machines, which, in addition to the mint, occasionally deliver tokens "good for five cents in trade" (State v. Ellis, 200 Iowa 1228, 206 N. W. 105), or, in addition to the mints, tokens good for a replay are occasionally given out (State ex rel. Manchester v. Marvin, 211 Iowa 462, 233 N. W. 486), pinball machines, which entitle the player to a replay on receiving certain scores (State v. Wiley, 232 Iowa 443, 3 N. W. 2d 620), are gambling devices.

The fact that the appellant may not have owned the slot machines does not aid him. They were in the building for operation and in operation. Most of them had coins in them when seized.

■ II. The record also sustains a finding that appellant was a "keeper" of a gambling house in said night club, as provided in said Code section 13199, at and before the seizure under the search warrant. We have set out above the factual record bearing upon this issue. Further comment is unnecessary. We briefly refer to significant and important facts shown therein: In September 1943, appellant declared that he was the owner of the "Mainliner"; on December 30, 1944, a beer permit good for one year was issued jointly to him and his wife; he received a deed to a one-half interest in the real estate on January 2, 1945; he gave in the real and personal property for assessment on April 6, 1945; in the property which he listed for assessment were some of the gambling equipment which were seized; he listed this property as his own, and not that of his wife; had he done the latter he would have listed it as required by section 6956, Code, 1939 (section 428.1, Code, 1946), and by section 6957, Code, 1939 (section 428.2, Code, 1946), which provides that "Any person required to list property belonging to another * * * *shall list it separately from his own, giving the assessor the name of the person or estate to which it belongs."* (Italics supplied.) He was present in various parts of the building, behind the liquor bars, the counter with the cash register; he was in the taproom, where the slot machines were,

and in the northeast room where the black-jack, dice, and card tables were; he had access to the keys of the slot machines and produced them on request; he was solicitous that no injury be done to the slot machines; he aided in detaching them from the floor so that the risk of injury was lessened; he made it his business to leave a sly intimation with his codefendant, Knote, the operator of the dice table, which was in operation, that he "didn't know anything"; his remarks in the automobile on the way to the office of the justice of the peace are quite revealing: "if you were in the racket sooner or later you would get caught up with," but "he didn't particularly care"—even though he was "caught up with"—"he had plenty of money to take care of him the rest of his life."

Opposed to this evidence supporting the charge in the indictment was the fact that Gladys Rand had a one-half interest in the real estate; there were some evidence and offers of evidence that Gladys Rand attended to many of the business affairs of the Mainliner Night Club with various purveyors of merchandise and services; checks of the Mainliner Night Club, as the record shows, payable to these purveyors and signed by Gladys Rand were offered. This evidence and offers, consisting of testimony and exhibits, were objected to and the objections were sustained. The evidence and offers were vulnerable to the objections and there was no prejudicial error in the rulings. All of it was hearsay.

There was no reversible error in the rejection of Exhibit I. It was apparently a statement of Gladys Rand of her ownership of the Mainliner, filed under the "trade name" statute on August 19, 1940. It was almost five years prior to the seizure of June 22, 1945, and at a time when she had sole record title to the real estate, and over four years before appellant acquired an undivided interest therein on January 2, 1945. Included in the objections to the offer of the exhibit was that it related to a period too remote. Just what Exhibit J is does not definitely appear. It may have been a statement similar to Exhibit I, but it bears date of *November 2, 1945,* long after the raid was made and seventeen days before the trial. Both exhibits were rightly rejected. What we have already said about Exhibit K, appar-

ently another Mainliner check, given to the county treasurer to pay taxes assessed in *1944* against some unspecified personal property, at 6001 Southwest Twenty-first Street, of Gladys Rand, indicates that there was no error in its rejection.

There is undisputed testimony in the record that the appellant had an interest and ownership in this property. It was not essential to the State's case that it show such ownership in order to establish that the appellant was a "keeper" under said section 13199. It was necessary only to show that he had charge of or attended to such place. Under the record the verdict of the jury that appellant was a "keeper" has ample support, notwithstanding Gladys Rand had some ownership in the place. The jury were fully justified in finding that appellant had such charge and attendance of the place as to be a "keeper" under section 13199.

The State established all essential elements of the crime charged by sufficient admissible testimony. Appellant's motions to direct a verdict in his favor at the close of the State's case and after each side had rested were rightly overruled. Unless there is reversible error in the assignments not yet considered the judgment should be affirmed.

■ III. The appellant argues strenuously that the court erred in receiving testimony as to sales of whisky at the Mainliner, as to the seizure, loading, carrying away of whisky, its being kept in view of the jury during the trial, its examination and identification by witnesses in the presence of the jury, the testing of two bottles of whisky by a chemist and his testimony that it was whisky. As the prospective jurors were seated in the box and available on call deputy sheriffs brought the exhibits —the gambling devices and the boxes of whisky, gin, and rum—into the courtroom, Appellant at once objected to the display of liquor, since the defendants were on trial for keeping a gambling house, that the liquor was not pertinent or material and would prejudice the jurors against the defendants, and that the display was incompetent, immaterial, and irrelevant and had not yet been offered. On assurance that the liquor would be identified and offered the court overruled the objections.

All other testimony respecting liquor was received subject to the objection of its incompetency, etc., and that it was not pertinent to any issue. At the conclusion of the submission the court directed that, because of lack of room in the jury room, the bulky exhibits such as slot machines, tables, and boxes of liquor should be left in the courtroom but available to examination by the jury. Appellant objected to this order so far as it applied to the liquor.

Briefly, the appellant's contention is that the liquor was not pertinent to any issue and was introduced to take advantage of the prejudice of many people against intoxicating liquor, thus requiring the appellant ''by the rules of court to face two separate and distinct offenses * * * under one indictment and in one trial.''

The matter of the admissibility of items of testimony in the trial of an accused which disclose his criminality in a matter other than the offense with which he is charged and being tried has many times troubled the courts of Iowa and of all other jurisdictions. It is a general rule in this State and elsewhere that evidence of other crimes of an accused on trial, separate and distinct from the one with which he is charged, may not be given in the trial of the latter. There are sound reasons for this rule. Among them being that his character may not be attacked in that way, and the State is not permitted to prove other independent crimes for the purpose of showing a likelihood or disposition of the defendant to commit the crime on trial. The basic reason is that the commission of another crime ordinarily has no proper relevance to the commission of the crime for which the defendant is being tried. One may be an habitual criminal and yet innocent of the crime for which he is indicted and being tried. And yet the proof of an independent crime, while logically of no relevance, may incline the mind of a juror more readily to the belief that the defendant might have committed the crime with which he is under charge. For this reason courts should be vigilant in the exclusion of such evidence when it is without relevance or there is fair doubt of its relevance. It is thus seen that the admissibility of such testimony is all a matter of relevance. The test of admissibility is

the connection and relevance of the facts proved with the offense charged: whether it fairly tends to prove that particular offense or an essential element thereof. People of the State v. Kasallis, 385 Ill. 158, 52 N. E. 2d 209; People v. Bloom, 370 Ill. 144, 18 N. E. 2d 197. As said in People v. Wood, N. Y., 3 Parker Crim. Rep. 681, 684:

"The proper inquiry, when the circumstance is offered, is, does it fairly tend to raise an inference in favor of the existence of the fact proposed to be proved. If it does, it is admissible, whether such fact or circumstance be innocent or criminal in its character."

In a much-quoted, ably written opinion on the question, in State v. LaPage, 57 N. H. 245, 288, 24 Am. Rep. 69, 73, the court said:

"I think we may assume, in the outset, that it is not the quality of an action, as good or bad, as unlawful or lawful, as criminal or otherwise, which is to determine its relevancy. I take it to be generally true, that any act of the prisoner may be put in evidence against him, provided it has any logical and legal tendency to prove any matter which is in issue between him and the state, notwithstanding it might have an indirect bearing, which in strictness it ought not to have, upon some other matter in issue. It may be, that in some cases the danger resulting from such indirect bearing might be so great in comparison with its importance in regard to matters on which its bearing was legitimate, that it ought not to be admitted. *But I think the general rule is, that no testimony which has a legitimate bearing upon any point in issue can be excluded.*" (Italics supplied.)

In State v. Adams, 20 Kan. 311, 319, Justice Brewer said:

"* * * whatever testimony tends directly to show the defendant guilty of the crime charged, is competent, although it also tends to show him guilty of another and distinct offense. * * * A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him."

Whether the testimony of extraneous matters shows the defendant in a good light or a bad light is merely a coincidence and immaterial. In State v. Johnson, 221 Iowa 8, 16, 264 N. W. 596, the defendant was being tried for murder committed in Burlington, Iowa, on the morning of the 27th. Evidence of the defendant's hold-up of a night club near Galesburg, Illinois, on the 25th was admitted. Justice Parsons said:

"What were the means of observation of the person identified? It could only be claimed that this was not admissible because it was the commission of another crime for which the defendant could be indicted. Unfortunately for the defendant, instead of the witnesses seeing him in a church choir, they saw him committing the crime * * * And there is no reason why the circumstances under which he was seen cannot be shown, even though it shows another crime in cases of this character.''

In the case before us the question is whether the appellant was a keeper, or in charge of, or in attendance upon, the operation of the Mainliner. We hold that the evidence fairly shows that he was. He was in and about the bars in the place, in the taproom where the slot machines were being played, in the gambling room where the "crap" game was in progress. In the taproom three bartenders behind the sixteen-foot bar waited on the trade. Bottles of whisky stood upon the bar. Rum, gin, and whisky, in filled and partly filled bottles, were behind and beneath the bar. All of this the jury could rightly have found was under the eye or direction of the appellant. Had the waitresses been carrying milk or Coca Cola on their trays, testimony thereof would have been properly admissible as bearing upon the appellant's connection with and relation to the operation of the business—his care, custody, charge, or attendance upon the same. The fact that these waitresses were carrying "shot" glasses of whisky to the patrons and the players of the slot machines was just as properly admissible on this issue. There was evidence that patrons were drinking and playing the slot machines.

Appellant concedes that there are exceptions to the general

rule that evidence of other independent crimes is not permitted. He cites the case of State v. Vance, 119 Iowa 685, 687, 94 N. W. 204, which holds that such evidence is competent to establish motive, intent, absence of mistake or accident, common scheme, and identity of person. But he argues that the challenged evidence in this case does not come within any of these exceptions. Conceding this, at least for the purpose of argument, yet there is a broader and more general exception. Wigmore speaks of it, in section 218 of his second and third editions on Evidence, thus, quoting from the 2nd edition:

"Res Gestae and Acts a part of the Issue; Inseparable Crimes. There is, however, an additional class of cases in which the misconduct of a defendant may be received, irrespective of any bearing on character, and yet not as evidential of one of the above matters (design, motive, or the like), or as relevant to any particular subsidiary proposition. *That class includes other criminal acts which are an inseparable part of the whole deed.* * * * While thus, on the one hand, these concomitant crimes are not obnoxious to the reasons of the character-rule, so also they are necessarily gone into in proving the entire deed of which the act charged forms a part. There is therefore not only a necessity for proving them, but no objection against proving them."

The eminent author criticises the term "res gestae," for reasons stated, as one which "should be once and for all abandoned as useless and confusing. Let it be said that such acts [are] receivable as 'necessary parts of the proof of an entire deed', or 'inseparable elements of the deed', or 'concomitant parts of the criminal act', or anything else that carries its own reasoning and definition with it; but let legal discussion sedulously avoid this much-abused and wholly unmanageable Latin phrase." The term, however, is quite generally used in this connection. We applied the rule and used the term in State v. Bigelow, 101 Iowa 430, 432, 70 N. W. 600. In 22 C.J.S., Criminal Law, section 663, it is stated:

"Evidence of another and distinct crime is admissible where

it was committed as part of the same transaction and forms part of the res gestae. Stated in another way, the rule is that acts which are res gestae are admissible, even though. they may show the commission by accused of another crime or other crimes.''

See, to like effect, 16 C.J., Criminal Law, section 1115. See, also, 20 Am. Jur., Evidence, section 310, where the author states:

''Evidence of other crimes is always admissible when such evidence tends directly to establish the particular crime * * * When the fact of a former crime is an element in the offense charged * * *.''

And, in 22 C.J.S., Criminal Law, section 683, the author states:

''The general rule of exclusion does not apply where the evidence of another crime tends directly or fairly to prove, or throw light on, accused's guilt of the crime charged, or to connect him with it, or to prove some particular element, or material fact in such crime * * *.''

This court has repeatedly announced and followed the rules of exception noted above. In State v. Dunne, 234 Iowa 1185, 1195, 15 N. W. 2d 296, 301, speaking by Justice Garfield, we said:

''While it is said to be the general rule that evidence is not receivable of a crime not charged in the indictment, there are well-recognized exceptions to the rule. Evidence of another offense is admissible where it is so related to the offense charged that proof of the former tends to establish the latter * * * Evidence otherwise competent to prove some fact material to the crime charged is not inadmissible because it tends to prove defendant guilty of another crime.''

We have repeatedly held that:

''* * * where the acts are all so closely related in point of time and place and so intimately associated with each other

that they form one continuous transaction, the whole transaction may be shown * * *.'' State v. Robinson, 170 Iowa 267, 276, 152 N. W. 590, 593.

See, also, State v. Hickman, 195 Iowa 765, 771–773, 193 N. W. 21; State v. Hogan, 145 Iowa 352, 355, 124 N. W. 178; State v. Huntley, 204 Iowa 981, 983, 216 N. W. 67; State v. Johnson, supra, 221 Iowa 8, 13–18, 264 N. W. 596; State v. Dooley, 89 Iowa 584, 588, 589, 57 N. W. 414; State v. Wallack, 193 Iowa 941, 942, 188 N. W. 131; State v. O'Connell, 144 Iowa 559, 561, 562, 123 N. W. 201; State v. Griffin, 218 Iowa 1301, 1306, 1307, 254 N. W. 841; State v. Gainor, 84 Iowa 209, 213, 50 N. W. 947. In State v. Anderson, 216 Iowa 887, 892, 247 N. W. 306, the defendant was arrested for transporting intoxicating liquors. Testimony was admitted that a loaded .38-caliber revolver was found beside defendant on the seat of the automobile. It was held admissible as part of the res gestae. In State v. Clark, 160 Iowa 138, 145, 140 N. W. 821, 824, defendant was tried for stealing mink pelts in Bremer county. When he was arrested in Chicago mink pelts were found in his room. The court also permitted evidence that in his room was a valise containing wearing apparel and a loaded .38-caliber revolver, even though there was no claim that either had been stolen. This court held that it was proper to show the finding of the revolver. It said:

''Men who steal at night frequently carry a revolver. * * * The finding of the revolver was at the time of the discovery of the skins alleged to have been stolen, and was a part of that transaction.''

However, it held that the size of the revolver and that it was loaded should not have been shown. This is a strained distinction. If the fact of the presence of the revolver was admissible the other facts were also admissible. Men who steal at night usually carry something larger than a .22 caliber, and carry the gun loaded. On an appeal of this case after retrial (State v. Clark, 166 Iowa 123, 127, 147 N. W. 152, 153), it appears that just the finding of the revolver was shown. The

court held this proper "as a revolver is not an unusual part of the equipment of one who commits larceny at night."

In State v. Burzette, 208 Iowa 818, 824, 825, 222 N. W. 394, 397, the defendant was charged with murder in the first degree and found guilty of murder in the second degree. He killed the subdirector of a country school district, who came upon him as he was burglarizing the schoolhouse to get an oil-stove. Three weeks before he had stolen curtains from the schoolhouse and placed them in his shack near Clear.Lake. The defendant's accomplice confessed and was used as a witness for the state. Evidence was introduced of the finding of the curtains. The defendant made the same contention that appellant does in this case. Justice Evans, for the court, said:

"The contention is that this evidence served no material function in the case, and that its only effect was to permit the State to prove the commission of another crime. The evidence was not offered for the purpose of proving another crime. If the facts proved had a material bearing upon the issues in the case, they were admissible in evidence; and this would be true regardless of whether they constituted a crime or not. Were the facts pertinent? Melvin [the accomplice] had testified that the defendant told him that there was an oil stove in the school-house, and directed him to bring it out. Melvin being an alleged accomplice, the burden was on the State to corroborate his evidence. It was permissible, therefore, to the State to introduce any evidence which tended to corroborate Melvin in any material part of his testimony."

The record herein brings the challenged evidence within the rules of evidence stated above. It was competent, material, relevant, and had probative force and value as to every element of the crime charged. Its fair and reasonable tendency was to establish the crime charged and its elements. The Mainliner Night Club was operated as an eating house, a tavern for the sale of beer and hard liquor, and as a gambling house. All were conducted in the same building at the same time and under one management. Patrons of the place could patronize all depart-

ments. Beer, whisky, rum, and gin were available to all patrons. There were four bars. There was a bar in the slot-machine room and in the gambling room—the dice and card room. The sale of whisky and other intoxicating liquors was carried on to attract patrons to all departments of the night club. It was an inducement which brought them to the club. It was a part of the whole business. It is a fair assumption that many who came to drink stayed to gamble. All of the ninety-nine bottles of hard liquor were found behind and beneath the two bars in the slot-machine room and the gambling room. There is no evidence that the appellant served any customer with liquor of any kind, but there were employees who did so. He was active about the place and behind the bars and in the gambling rooms when liquor was being sold. He, of course, knew it was there and was being sold. Proof of these facts was proper for the consideration of the jury in determining his relation to the place and his connection with its operation. They had material evidential and probative value on this issue. The sale of this liquor and the operation of the gambling devices were all a part of the same business. The liquor was seized with the gambling devices, as were the revolvers in the cases herein cited.

In State v. Mulhollen, 173 Iowa 242, 246, 155 N. W. 252, 253, the defendant was charged and tried for keeping a house of ill fame. Evidence was permitted that she also sold beer. Speaking by Justice Evans, the court said:

"* * * we do not think the evidence necessarily objectionable as tending to show the commission of a separate crime. Intoxicating liquor is the companion of many crimes, and we see no reason why its presence and use may not be shown as one of the incidents of an alleged crime under investigation, and especially a crime of such nature as the one charged herein."

There was a like charge and a like holding in State v. Burley, 181 Iowa 981, 985, 165 N. W. 190, 192. The court said:

"* * * all things are receivable if they tend to establish or refute the accusation on trial; and this though what is received tends to show what in itself constitutes a crime. *The test is not what act is being offered, but whether the offer is*

*material and relevant.* * * * If, then, we are to sustain appellant, we must hold that, in spite of these indications in our decisions, it is, as matter of law, immaterial and irrelevant to show, in proof of a charge of maintaining a house of ill fame, that the owner furnished liquor to visitors. So to hold is to throw away common knowledge that liquor getting and drinking is a badge of the bawdy-house. We are not minded to do this."

In State v. Mauch, 236 Iowa 217, 220, 17 N. W. 2d 536, the defendant was charged with keeping a house of ill fame. Under a search warrant bottles of whisky and gin with liquor seals of foreign states, shot glasses, and punchboards were found in the house. They were held admissible as "various badges of a bawdy house." These decisions point the way to a proper ruling in this case. Other courts have reached like conclusions. See Harris v. United States, 6 Cir., Mich., 13 F. 2d 849; Thaler v. United States, 6 Cir., Ohio, 261 F. 746; Claiborne v. State, 100 Tex. Crim. Rep. 322, 273 S. W. 260. It is common knowledge that the drinking of intoxicants ordinarily loosens the normal inhibitions and restraints. It is for this reason that their sale is customary in houses of ill repute. If such sale is a concomitant and an advantage and an asset to a house of prostitution, it is a fair and reasonable inference that the same is true of a gambling house. But if it should be contended that our conclusion is erroneous, there was no prejudicial error in the court's rulings respecting the intoxicating liquor. For it instructed the jury that "the fact, if it be a fact, that intoxicating liquors were seized at the Mainliner or that some was sold, cannot be considered by you in arriving at your verdict as to whether or not the defendants or either of them were guilty of keeping a gambling house as charged in the indictment. The evidence in reference to exhibits containing bottles of alleged liquor was received in the case, because it was a part of the same transaction wherein it is alleged the other exhibits were seized." We must assume that the jury obeyed this direction to give the matter of intoxicating liquor no consideration.

The appellant took no exception to the instruction except the last four lines thereof. His complaint was that these focused

the attention of the jury to the liquor and permitted them to consider it as a part of the same transaction as the gambling charge.

There is no merit to the exception. The entire instruction was unfair to the State and entirely too favorable to the appellant. This testimony was relevant and admissible and the jury should have been told that it was for their consideration in arriving at a verdict of the guilt or innocence of the appellant of the charge of keeping a gambling house. There is no merit to this assignment of error.

■ IV. Appellant complains of the admission of the testimony of Sims, Vanderlinden, and Nyberg respecting the occurrence of September 14, 1943. It is without merit. The court particularly cautioned these witnesses to confine their testimony strictly to the admissions of the appellant respecting his connection with the Mainliner. They did so except when Sims inadvertently spoke of "this load of liquor." The court promptly struck what was said before the sentence was completed. Furthermore, appellant's attorney prior to this slip of the tongue had himself injected the matter of "transporting" by an objection. This assigned error is not good.

V. Appellant objects generally to the instructions as a whole. There is no basis for the complaint. The issues were few and simple and were adequately and correctly covered by the court's charge.

■ VI. Appellant's requested Instruction No. 3, that the appellant was required under the statute to list the property of his wife for taxation, was rightly refused for reasons hereinbefore stated.

■ The same is true of request No. 2. Requested Instruction No. 1 was fully covered in the court's instructions.

It is our conclusion, after carefully considering all matters complained of, that the appellant received a fair trial, free from any reversible errors, and that the record and evidence fully sustain the verdict of the jury. The judgment is therefore—
Affirmed.

All JUSTICES concur.